**WHOLE COURT**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**March 30, 2016**

# In the Court of Appeals of Georgia

A15A2303. SMITH v. NORTHSIDE HOSPITAL, INC., et al.

A15A2304. NORTHSIDE HOSPITAL, INC., et al. v. SMITH.

DILLARD, Judge.

In Case No. A15A2303, E. Kendrick Smith, an attorney, appeals the trial court's dismissal, after a bench trial, of his action to compel Northside Hospital, Inc. and its parent company, Northside Health Services, Inc. (collectively, "Northside"), to provide him with access to certain documents in response to his request under the Georgia Open Records Act ("GORA" or "the Act").[1] On appeal, Smith argues that the trial court erred in finding that the documents were not "public records" within the meaning of the Act and in ordering a separate trial to determine whether those documents are exempt from the Act as trade secrets. Northside cross-appeals in Case

---

[1] *See* OCGA §§ 50-18-70 *et seq*.

No. A15A2304, arguing that the trial court erred by preventing it from seeking any information regarding the identity of Smith's client or clients, who Northside believed were the actual parties behind the GORA request, and Smith's purpose for bringing this lawsuit. For the reasons set forth *infra*, we affirm the trial court's dismissal of Smith's case and dismiss Northside's cross-appeal as moot.

The facts relevant to this appeal are largely undisputed.[2] In 1966, the Commissioners of Roads and Revenues of Fulton County passed a resolution creating the Fulton County Hospital Authority (the "Authority"), which would "have and

---

[2] To the extent that there are any disputed facts in this case, we note that, "[i]n reviewing a judgment entered in a bench trial, we construe the evidence in favor of the judgment and the court's factual findings will not be disturbed when supported by any evidence." *Callahan v. Hall*, 302 Ga. App. 886, 887 (691 SE2d 918) (2010) (punctuation omitted). We further note that the first eight pages of the "Statement of Material Facts" in Smith's appellate brief include only a single record citation, which is in a footnote and merely references an amicus brief from an unrelated case. The burden, of course, is on "the party alleging error to show it affirmatively by the record[,] [and] [w]hen the burden is not met, the judgment complained of is assumed to be correct and must be affirmed." *Fleming v. Advanced Stores Co.*, 301 Ga. App. 734, 736 (688 SE2d 414) (2009) (punctuation omitted); *see also* COURT OF APPEALS RULE 25 (c) (2) (i). Further, to the extent that any of Smith's alleged "material facts" in this portion of his brief are supported by the more than 7,000 pages of record, we take this opportunity to remind him that "it is not the function of this Court to cull the record on behalf of a party in search of instances of error." *Fortson v. Brown*, 302 Ga. App. 89, 90 (1) (690 SE2d 239) (2010) (punctuation omitted).

2

exercise all of the powers granted and prescribed in the Hospital Authority Laws."[3] The Authority was created because of the need in Fulton County for improved and increased hospital facilities to serve the community. And to that end, the Authority opened Northside Hospital, which it owned and operated for approximately the next 25 years. In the early 1990s, the Authority, recognizing "the rapidly changing healthcare environment in which it operate[d]," undertook a study, with the help of consultants, to determine how best to improve the hospital's operations. Ultimately, the Authority concluded that the best option to achieve its goals was to restructure through a long-term lease of the hospital and related assets for operation by a private, charitable, nonprofit corporation. The Authority further determined that "[r]ecent developments and opportunities affecting the ability of the [h]ospital to remain competitive and to enhance its position as a principal provider of specialty healthcare services . . . reinforced the importance of restructuring to the long term competitive position of the [h]ospital."

Based on the foregoing assessments, the Authority created Northside Hospital, Inc., a private, nonprofit corporation, and on November 1, 1991, it executed a lease

---

[3] *See* OCGA §§ 31-7-70 *et seq.*

3

and transfer agreement with the newly formed entity to facilitate the restructuring.[4]

Under this agreement, the Authority leased the hospital's facilities and transferred all of its operating assets and existing operations to Northside for a term of 40 years. In exchange, Northside agreed to operate the hospital subject to certain restrictions, pay all of the Authority's debts and assume all of its liabilities incurred in connection with the leased facilities and operating assets, and make a yearly rent payment of $100,000. The leased facilities included the real property, the hospital, a surgery center, office buildings, and improvements.

Relevant to the instant dispute, between 2011 and 2013, Northside entered into transactions to acquire four privately owned physician groups: Atlanta Cancer Care ("ACC"), Georgia Cancer Specialists ("GCS"), Atlanta Gastroenterology Associates ("AGA"), and Atlanta Surgery Center, Ltd. ("ASC") (collectively, "the acquisitions"). In 2013, after learning of these transactions, Smith, a partner at an Atlanta law firm,

---

[4] The lease noted that the Authority's restructuring plan was authorized by OCGA §§ 31-7-70 *et seq.* and the Supreme Court of Georgia's decision in *Richmond County Hosp. Auth. v. Richmond County*, 255 Ga. 183 (336 SE2d 562) (1985). Private hospitals such as Northside created under similar restructuring plans by government entities are sometimes referred to in the parties' briefs and throughout the record as "*Richmond* hospitals." *See* OCGA § 31-7-75 (7) (granting hospital authorities the power to enter lease agreements to, *inter alia*, "promote the public health needs of the community").

4

sent a letter to Northside and the Authority, entitled "Open Records Request," seeking access to financial statements and other documents related to the acquisitions. Specifically, the letter identified 15 different categories of requested documents related to each acquisition, including, for example, "[a]ll contracts, agreements, instruments, or other documents by which the [a]cquisition was effected in whole or in part"; "any indemnification agreements and any agreements concerning the management or operation . . . of any medical or healthcare practice acquired . . ."; documents that "constitute, evidence or reflect any consideration, compensation, or remuneration of any type provided by or on behalf of [Northside]"; and "[a]ll documents that constitute, evidence, or reflect any strategic plan or business forecast for assets, membership interests, or any other property or interest acquired in the [a]cquisition" for the 24 months preceding the acquisition.

In a letter dated October 14, 2013, the Authority responded to Smith, informing him that it did not possess any records or documents that were responsive to his request.[5] On the same day, Northside also responded to Smith, asserting that it is a private, nonprofit hospital that is not subject to GORA, and even if it was, the

---

[5] Smith has never disputed that the Authority did not possess any of the requested documents.

5

requested documents, which are "highly sensitive," would be exempt under various provisions of the Act, including the trade-secrets exemption. In addition, Northside informed Smith that it had entered into binding confidentiality agreements that prohibited disclosure of the requested documents. For these reasons, Northside declined to comply with Smith's request. Smith replied only to Northside, asserting that it was subject to the GORA because, even though it is a private entity, it performs a service or function for or on behalf of the Authority, which is a public agency within the meaning of the Act, and that no exemption applied. Nevertheless, Northside maintained that it was not subject to the Act and declined to provide Smith with access to any documents related to the acquisitions.

Subsequently, on November 15, 2013, Smith filed a complaint against Northside, requesting that the trial court compel Northside to comply with his GORA request. Northside answered and asserted a counterclaim, alleging that Smith brought this action in bad faith on behalf of one or more of his corporate clients that are competitors of Northside.[6] Smith then moved the court to dismiss Northside's

---

[6] Northside also filed a motion to dismiss the case on the basis that Smith was not the real party in interest, but the trial court denied the motion, noting that the language of the GORA allows "any person, firm, corporation or other entity" to bring an action in superior court to enforce compliance with its provisions. *See* OCGA § 50-18-70.

6

counterclaim, arguing that the purpose of his GORA request is immaterial as a matter of law, and the trial court granted the motion. However, throughout discovery, Northside continued to seek information regarding the identity of Smith's client or clients, who Northside contended were the real parties seeking access to its documents, as well as the purpose behind the parties making the GORA request and filing the lawsuit. Rather than answering Northside's discovery requests, Smith filed a motion for a protective order preventing Northside from seeking such information. And after a hearing on the matter, the trial court issued the protective order "prohibiting any discovery concerning [ ] Smith's purposes in bringing the action, or the identity and purposes of any of his alleged clients."

Discovery continued and, approximately one year into the litigation, three of the private practices that Northside acquired—AGA, ACC, and GCS—moved to intervene in the case to protect their own interests in keeping the requested documents confidential. AGA and ACC sought to intervene as defendants, and GCS sought to intervene as a third-party plaintiff to file a petition for declaratory relief. After a hearing on the matter, the trial court granted their motions.

Following protracted litigation, the case ultimately proceeded to a bench trial, which was bifurcated to resolve the two dispositive issues before the trial court: (1)

whether the documents in question were "public records" under GORA; and (2) if so, whether the records contained exempt trade secrets. After Smith presented his evidence as to the first issue, Northside and the intervenors moved for an involuntary dismissal of the case, but the trial court denied the motion. However, when Northside and the intervenors renewed the motion after the close of all the evidence on the first issue, the court granted it. Smith now appeals the trial court's dismissal of his case, and Northside cross-appeals, contending that the court erred in issuing the protective order precluding it from seeking information about the identity and motives of Smith's corporate client or clients behind this action.

*Case No. A15A2303*

1. Smith first argues that the trial court erred in finding that Northside's records concerning its acquisition of the four physician practices are not "public records" subject to GORA. We disagree.

At the outset, we note that on appellate review of a bench trial, the factual findings shall not be set aside unless clearly erroneous, and "due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."[7] Further,

_____

[7] *Brock Built, LLC v. Blake*, 316 Ga. App. 710, 712 (730 SE2d 180) (2012) (punctuation omitted).

8

in bench trials, the judge sits as trier of fact, and "the court's findings are analogous to a jury's verdict and should not be disturbed if there is any evidence to support them."[8] However, we review any questions of law decided by the trial court *de novo*.[9] Further, in ruling on a motion for an involuntary dismissal, "the trial court was not required to construe the evidence most favorably [to Smith]."[10] And since the trial court determines the facts as well as the law, it necessarily follows that "the motion may be sustained even though plaintiff may have established a prima facie case."[11] Indeed, at a bench trial, the trial court "can determine when essential facts have not been proved, [and] [t]he trial court's determination as a trier of fact will be reversed only where the evidence demands a contrary finding."[12] With these guiding principles in mind, we turn now to Smith's specific claim of error.

---

[8] *Id.* (punctuation omitted).

[9] *Washington v. Harrison*, 299 Ga. App. 335, 336 (682 SE2d 679) (2009).

[10] *Ivey v. Ivey*, 266 Ga. 143, 144 (1) (465 SE2d 434) (1996); *accord Smith v. Ga. Kaolin Co.*, 269 Ga. 475, 476 (1) (498 SE2d 266) (1998).

[11] *Ivey*, 266 Ga. at 144 (1) (punctuation omitted); *see also Smith*, 269 Ga. at 476 (1).

[12] *Ivey*, 266 Ga. at 144 (1) (punctuation and citation omitted); *accord Smith*, 269 Ga. at 476 (1).

9

As previously mentioned, Smith argues that the trial court erred in dismissing his case because Northside, even though it is a private entity, is subject to GORA. In doing so, he essentially contends that *all* of Northside's records, including the requested records, are "public records" because it was created by the Authority as a vehicle to act on the Authority's behalf. Further, he argues that the trial court improperly focused on what it perceived to be a lack of evidence of the Authority's "direct involvement in the transactions at issue," rather than "the undeniably public nature of the Northside healthcare system," and Northside's role in the acquisitions.

In considering the merits of Smith's appeal, we begin, as we must, with the applicable statutory text of GORA,[13] which requires that "[a]ll public records shall be open for personal inspection and copying, except those which by order of a court of this state or by law are specifically exempted from disclosure."[14] Thus, when there is a "request for disclosure of documents under the Public Records Act, the first inquiry

---

[13] *See In re L. T.*, 325 Ga. App. 590, 591 (754 SE2d 380) (2014) ("[I]n considering this question of statutory interpretation, we necessarily begin our analysis with familiar and binding canons of construction." (punctuation omitted)); *accord Martinez v. State*, 325 Ga. App. 267, 273 (2) (750 SE2d 504) (2013).

[14] OCGA § 50-18-71 (a).

is whether the records are 'public records.'"[15] And the Act defines "public records" as

> all documents, papers, letters, maps, books, tapes, photographs, computer based or generated information, data, data fields, or similar material prepared and maintained or received by an agency *or by a private person or entity in the performance of a service or function for or on behalf of an agency* or when such documents have been transferred to a private person or entity by an agency for storage or future governmental use.[16]

As we have recognized, GORA was "enacted in the public interest to protect the public from 'closed door' politics and the potential abuse of individuals and misuse

---

[15] *Napper v. Ga. Television Co.*, 257 Ga. 156, 160 (a) (356 SE2d 640) (1987); *accord Nw. Ga. Health Sys., Inc. v. Times Journal, Inc.*, 218 Ga. App. 336, 338 (1) (461 SE2d 297) (1995); *see also United HealthCare of Ga., Inc. v. Ga. Dep't of Cmty. Health*, 293 Ga. App. 84, 87 (666 SE2d 472) (2008).

[16] OCGA § 50-18-70 (b) (2) (emphasis supplied). We note that, here, it is undisputed that the Authority is a public "agency" within the meaning of the Act and that Northside is a private, nonprofit corporation. *See Cox Enterprises, Inc. v. Carroll City/Cty. Hosp. Auth.*, 247 Ga. 39, 45-46 (273 SE2d 841) (1981) (determining that a city/county hospital authority is a "governmental entity"); *Griffin Spalding Cty. Hosp. Auth. v. Radio Station WKEU*, 240 Ga. 444, 445 (1) (241 SE2d 196) (1978) (noting that "the 'hospital authority's law' describes a [county hospital] authority as a public corporation").

11

of power such policies entail."[17] Thus, the Act must be "broadly construed to effect its remedial and protective purposes."[18] But even though the Act has been "broadly applied as it relates to public offices or agencies to ensure adequate public access to public records, it should not be construed broadly and in derogation of its express terms so as to bring private entities within the purview of the statute."[19]

In the case *sub judice*, contrary to Smith's contention, the trial court did not dismiss this case based on a general determination that Northside was not subject to the Act at all. Instead, the court simply found that Smith presented no evidence that Northside entered into or performed any of the *four transactions at issue* on behalf of the Authority or exercised any of the Authority's powers when doing so. Without question, the plain language of GORA, set forth *supra*, provides that documents or

---

[17] *United HealthCare of Ga., Inc.*, 293 Ga. App. at 86 (punctuation omitted); *see also Wallace v. Greene Cty.*, 274 Ga. App. 776, 782 (2) (618 SE2d 642) (2005).

[18] *United HealthCare of Ga., Inc.*, 293 Ga. App. at 86 (punctuation omitted); *accord Wallace*, 274 Ga. App. at 782 (2).

[19] *United HealthCare of Ga., Inc.*, 293 Ga. App. at 86-87 (punctuation omitted); *accord Corp. of Mercer Univ. v. Barrett & Farahany, LLP*, 271 Ga. App. 501, 503 (1) (a) (610 SE2d 138) (2005), *superseded by statute on other grounds*; *see also Evans v. Ga. Bureau of Investigation*, 297 Ga. 318, 319 (773 SE2d 725) (2015) ("[A]lthough exemptions from disclosure under the Open Records Act are narrowly construed, the Act obviously should not be construed in derogation of its express terms." (punctuation omitted)).

records "prepared and maintained or received by" a private entity (such as Northside) "in the performance of a service or function for or on behalf of" a public agency are subject to the Act.[20] Thus, despite Smith's characterization of the issue before this Court as whether Northside, as a "*Richmond* hospital," is subject generally to GORA, the more pertinent question is whether the specific requested documents were prepared and maintained or received by Northside in the performance of a specific service or function for or on behalf of the Authority.[21]

---

[20] OCGA § 50-18-70 (b) (2). The dissent contends that our opinion holds that Northside is not the vehicle through which the Authority carries out its official duties, suggesting that our conclusion is that Northside is not subject to GORA. This is a mischaracterization of our holding. Instead, we have simply noted that, under the plain terms of the Act, records of *any* private entity may be subject to GORA to the extent that the *particular* records requested meet the criteria of OCGA § 50-18-70 (b) (2). As explained *supra*, in considering whether specific requested documents are subject to the Act, our first task is to determine whether those particular documents are "public." *See supra* footnote 15 & accompanying text. The dissent would render this analytical step meaningless by holding that *all* of a *Richmond* hospital's documents are public merely because it is generally subject to GORA. But this would effectively (and impermissibly) transform Northside into a public entity for the purposes of GORA. Suffice it to say, there is nothing in the text or structure of GORA remotely supporting such a sweeping construction of the statute. *See supra* footnote 19 & accompanying text.

[21] *See* OCGA § 50-18-70 (b) (2) (providing that "public record[s]" include those "prepared and maintained or received . . . by a private person or entity in the performance of a service or function on or on behalf of an agency . . . "); *see also Hackworth v. Bd. of Educ. for City of Atlanta*, 214 Ga. App. 17, 19-20 (1) (a) (447 SE2d 78) (1994) ("Because of the statutory definition, our focus in cases under the

13

And here, the undisputed testimony and other evidence established that, in 1991, there was a complete severance between the Authority and Northside's business decisions and operation of the hospital. Turning first to the 1991 lease-transfer agreement, the parties agreed that, under Section 2.4, the purpose of the lease was to "effect . . . the transfer of control over all of the Leased Facilities, the existing Operations and the Operating Assets to Northside" in exchange for Northside operating the hospital, assuming the Authority's debts and obligations related to the leased property, and making a yearly rent payment of $100,000. This section further provides that "Northside during the term [of the lease] shall use the Operating Assets and Existing Operations so transferred to it in the operation of the Leased Facilities and in furtherance of *Northside's purposes* as set forth in its Articles of Incorporation and as otherwise permitted" by the lease. In addition, Section 7.2 of the lease provides that "[s]o long as Northside is not in default under this Agreement,

---

Act is necessarily not on the actor but on the particular, discrete *function* performed by that actor. We must determine whether that function is a public one, rendering the records generated in the course of its performance subject to the Act."). As demonstrated in footnote 47 *infra*, when considering GORA requests served on private entities with public affiliations, Georgia courts have focused on whether the specific "requested documents" qualify as public records under the particular facts of each case, not whether the private entity itself is or is not subject to the Act.

14

Northside shall have *sole and exclusive* charge of the operation of the Leased Facilities."

In executing the lease, the Authority retained only four specified powers: (1) to prepare and adopt an annual budget for the Authority and to conduct a yearly audit; (2) to file certain reports required by law regarding the Authority's activities; (3) to cooperate with Northside and to use its best efforts to issue revenue anticipation certificates or other evidence of indebtedness in accordance with the Agreement; and (4) to enter contracts with government agencies to obtain funds and to receive funds and grants from same for the maintenance and operation of the hospital or to provide medical care to indigent persons and for other public health purposes. And not long after the lease was executed, in February 1992, the Authority also amended its bylaws to "clarify the fact that there ha[d] been a change in the Authority and that [it] *no longer ha[d] responsibility* for hospital operations." An Authority representative further indicated that the amendment was "needed to accurately reflect the Authority's actual role and avoid confusion" caused by both the Authority and Northside's bylaws "stating the same function."[22] Thus, the language of the lease

---

[22] The only witness at trial, who was a member of the Authority at the time when the 1991 lease-transfer agreement was executed, testified that the primary reason for the restructuring was to make the hospital more competitive. He explained

agreement itself provided that Northside would have *exclusive* control over the hospital's operations without interference from the Authority and that Northside would operate the hospital for its *own purpose*.[23]

As to the specific acquisitions at hand, the evidence showed that the Authority had no involvement whatsoever in those transactions. Specifically, the Authority's chairman testified that, although the Authority owns the assets that it leased to

---

that, as a government agency, the Authority could not expand its facilities outside of Fulton County, "could not enter into private transactions, could not enter into joint ventures, [and] could not enter into a for profit operation[ ]." In addition, he testified that, at the time, the Authority wanted to "remove politics from the governance so that it could operate without interference." According to this witness, under the lease-transfer agreement, Northside would operate the hospital, while the Authority would merely be "the landlord."

[23] As noted by the dissent, the lease-transfer agreement provides that one of the purposes of the agreement is to promote the public-health needs of the community in various ways. And the agreement also granted Northside the ability to transact business "in connection with the Leased Facilities," as well as to "stand in the place of the Authority" to perform any function that the Authority could legally perform. But given Northside's exclusive control over hospital operations and its ability to also act for its own purposes, we are unpersuaded that the lease-transfer agreement established, as the dissent suggests, that *any action ever taken* by Northside is necessarily taken on the Authority's behalf. In any event, regardless of the provisions of the lease-transfer agreement, GORA plainly provides that Northside's documents may only be rendered public if they actually *are* maintained or received on behalf of a public entity. *See* OCGA § 50-18-70 (b) (2) As discussed more fully *infra*, there is no evidence in this case that Northside entered the four specific transactions at issue on the Authority's behalf or at its direction.

16

Northside, it does not control the hospital's operations, and to his knowledge, the Authority has never instructed Northside to enter into any transactions. According to the chairman, the lease made "very clear" that Northside operates the hospital for its own purpose. He further explained that, although Northside and the Authority have a "friendly" and "cooperative" relationship, there is a "clear separation" between the two entities. As to the transactions at issue, the chairman testified that the Authority never requested that Northside acquire the physician practices, nor did it approve of those acquisitions in advance. In fact, the chairman *did not even know* about Northside's acquisitions until he read about them in the newspaper.

Similarly, Northside's director of finance and system controller, who was the Northside representative that had the most "direct and regular interaction" with the Authority, testified that the Authority had no involvement in the acquisitions and that Northside did not seek guidance from the Authority before negotiating and executing those transactions. In fact, she testified that "approval and direction is *never* sought from the Authority," and Northside never received support, financial or otherwise, from the Authority with respect to the acquisitions. The finance director knew "exactly what funds are used for what [Northside] projects and in what counties," and

17

her undisputed testimony was that no public funds were used to finance the acquisitions.

Representatives from the intervenors, who were directly involved in negotiating the transactions with Northside, also testified to the Authority's complete lack of involvement in the negotiation process. For example, the president of GCS testified that GCS negotiated solely with Northside, which it knew to be a private entity, and that he had no interaction whatsoever with the Authority in connection with the transaction. He further testified that GCS required Northside to sign a confidentiality agreement due to its concerns over providing Northside with sensitive information, and if GCS had known that the records it transferred to Northside would be provided to the Authority, GCS "probably would not have" entered into the transaction.

Likewise, the practice administrator of AGA testified that AGA provided "competitively sensitive and confidential" documents to Northside, and she was "stunned" when she learned of Smith's GORA request. Because AGA was not aware of any public entity that participated in the transaction, it was also unaware that it could be subject to the Act. Not only was the Authority not involved during the negotiations, but AGA's practice administrator had never even heard of the Authority

18

before this lawsuit. As with GCS, AGA "might not have entered into the transaction at all" if it knew that the documents it provided to Northside could be subject to a GORA request. Lastly, the chief executive officer of ACC also testified that the Authority was never involved in the negotiations between ACC and Northside, and that ACC was "surprised" when it learned of Smith's GORA request because it was dealing only with a private entity.

Ultimately, in granting Northside and the Intervenors' renewed motion for an involuntary dismissal, the trial court found that Smith had presented no evidence that Northside acquired any of the four private physician practices on behalf of the Authority or that the Authority discussed in advance, requested, approved, or authorized Northside to enter into those transactions. In arguing that the trial court erred in finding that the requested documents are not "public documents," Smith primarily relies on *Northwest Georgia Health Systems, Inc. v. Times Journal, Inc.*,[24] and *Clayton County Hospital Authority v. Webb*,[25] cases in which this Court held that certain requested documents of private entities were subject to a GORA request based

---

[24] 218 Ga. App. 336 (461 SE2d 297) (1995).

[25] 208 Ga. App. 91 (430 SE2d 89) (1993).

19

on their involvement with county hospital authorities.[26] However, these cases are readily distinguishable.

In *Northwest Georgia Health Systems*, a private entity's subsidiary hospital corporations contractually agreed to operate public hospital authority assets "for the public good" and the private entity's statement of corporate purpose was, in part, "to operate those assets for the benefit of and performing the function of [ ] several public hospital authorities."[27] In addition, seven members of the private entity's board of trustees were also members of five different hospital authorities.[28] Under such circumstances, we held that "these private, nonprofit corporations became the vehicle through which the public hospital authorities carried out their official

---

[26] Smith also relies heavily throughout his brief on *Richmond County Hospital Authority v. Richmond County*, 255 Ga. 183 (336 SE2d 562) (1985), the Supreme Court of Georgia case expressly holding that entering a lease-transfer agreement such as the one in this case is a valid exercise of a hospital authority's power under the Hospital Authorities Act. *See generally id. at* 184-92 (1)-(2). However, in *Richmond County*, the lease-transfer agreement expressly included a requirement that the private entity comply with GORA. *See id.* at 191 (2) (a). Because the instant case does not involve a challenge to the validity of the lease-transfer agreement, *Richmond County* is not relevant to the resolution of this appeal.

[27] *Nw. Georgia Health Systems, Inc*, 218 Ga. App. at 340 (1).

[28] *See id.* at 338.

responsibilities."[29] But here, Northside's bylaws contain no language indicating that the hospital's purpose was to act for the public good or as a vehicle to carry out the Authority's official responsibilities. And although, as discussed *supra*, the lease-transfer agreement granted Northside the *ability* to act on the Authority's behalf, it also provided that Northside was to operate the leased facilities for its *own* purposes and the Authority retained the power to take only four specific actions, none of which involved the acquisition of private physician practices. More importantly, the specific issue before us in *Northwest Georgia* was whether the trial court erred in granting the plaintiff's motion for declaratory relief, and by declaring that the private non-profit entities were subject to GORA and the Georgia Open Meetings Act.[30] In the case *sub judice*, the trial court's decision did not make a general declaration that Northside is

---

[29] *Id.*

[30] *See id*. The dissent contends that our decision in *Northwest Georgia* turned on the "overall nature of the relationships between the hospital authorities and the private, nonprofit corporations, not the particular transactions," and that a document-by-document analysis is only appropriate in determining whether particular documents are exempt from the Act. However, before we can consider whether particular documents are exempt from the Act, we must first determine whether the documents requested from the private entity may be deemed public, which generally turns on the nature of the transaction. *See infra* footnote 47 & accompanying text. Unlike this case, in *Northwest Georgia* there is no indication that the private entity disputed that, if it were subject to the Act, the specific requested documents were public in nature.

never subject to GORA, and that is not the holding of this Court. Instead, in line with long-standing Georgia jurisprudence, our analysis is centered on whether the particular requested documents are public.[31]

Furthermore, in *Webb*, unlike the instant case, the requested documents of the private entities remained in the "possession and control" of the hospital authority.[32] Based on the particular facts of that case, we held that there was a "sufficient basis to conclude that the private corporations functioned under the direction and control of the Authority to implement the Authority's duty to provide for the public health."[33] But here, unlike in *Webb*, the Authority did not possess or control any of the requested documents and the overwhelming evidence, detailed *supra*, established that, since its creation, Northside has never functioned under the direction and control of the Authority. Indeed, the Authority's chairman was *not even aware* of the private acquisitions in this case until they were reported publicly in the media.[34] Lastly, it is

---

[31] *See infra* footnote 47.

[32] *See Webb*, 208 Ga. App. at 94 (1).

[33] *Id.*

[34] Similarly to *Northwest Georgia*, the defendants in *Webb* "relied not on the specific content of any requested document to demonstrate its private nature, but rather on the claim that the documents were those of private corporations not subject

22

worth noting that neither *Northwest Georgia* nor *Webb* established a bright-line rule

that *all* of a private non-profit hospital's documents are subject to disclosure when it

is affiliated in any way with one or more county hospital authorities. Instead, the

holdings in those cases were based on the particular facts before the court.[35]

In support of its position that Northside was acting on behalf of the Authority

in entering the four private transactions at issue, the dissent relies on our decision in

*United HealthCare of Georgia, Inc. v. Georgia Department of Community Health*,[36]

in which we held that a private insurance company's documents relating to its

---

to the Act." *See Webb*, 208 Ga. App. at 95 (1). And the *Webb* Court noted that the private entities had not provided the requested records to the court, and explained that if the private corporations "intended to rely upon the *specific contents* of the withheld documents as a defense to production under the Act, they had the burden of producing the records for inspection by the court." *Id.* at 94-95 (1) (emphasis supplied). But unlike in those cases, Northside has maintained throughout this entire litigation that the specific documents requested by Smith are not public documents within the meaning of the Act.

[35] *See Nw. Ga. Health Sys., Inc.*, 218 Ga. App. at 340 (1) ("[T]he trial court in the case sub judice was authorized to conclude *on the facts before it* that [the private entities], as vehicles for public agencies, were subject to the Open Meetings Act, and that the requested documents were 'public records' under the Open Records [Act]." (punctuation omitted) (emphasis supplied)); *Webb*, 218 Ga. App. at 95 (1) ("Despite the private status of the corporations, the trial court was authorized to find *on the facts before it* that they were subject to the Act, and that the *requested documents* were 'public records' under the Act." (emphasis supplied)).

[36] 293 Ga. App. 84 (666 SE2d 472) (2008).

contract with the Georgia Department of Community Health for the administration of certain State benefits were public documents within the meaning of GORA.[37] However, rather than relying on the general nature of the relationship between the private and public entities, as the dissent would have us do, the Court in that case began with the "threshold question" as to whether the documents at issue were public records.[38] In considering the particular transaction at issue, we held that the documents were public records when, *inter alia*, the transaction involved "current and future expenditure of substantial public funds," and there was "*significant*" and "*active*" involvement of public officials.[39] Here, it is undisputed that no public funds were used to finance the relevant transactions and there was *no involvement* of any public officials.

The only evidence that Smith relies on to show the Authority's "involvement" in the acquisitions is evidence that Northside's chief financial officer also serves as the Authority's treasurer, Northside's chief legal services officer is also the Authority's secretary, and four members of the Authority also sit on Northside's

---

[37] *See id.* at 84, 87-89 (1).

[38] *See id.* at 87.

[39] *See id* at 88 (1).

24

board. However, he identifies no specific involvement of any of these individuals in their capacity as a member of the Authority with respect to Northside's acquisitions. Smith contends that the Authority's secretary, as Northside's chief legal services officer, "personally maintains the requested acquisition records." But the evidence presented below also showed that there was no relationship or overlap between her duties and responsibilities as the Authority's secretary, a voluntary position, and her duties and responsibilities as a Northside employee. In addition, the Authority's treasurer testified that she had been "told" that she was its treasurer, but she had "never been asked to do anything for the Authority." To the extent that this testimony created a conflict in the evidence, we must view the evidence in favor of the trial court's ruling.[40] Further, we note that, even if there was evidence that any Authority member was also involved in the acquisitions in their capacity as a Northside employee (which there is not), the Supreme Court of the United States has recognized that there is a "presumption that an act is taken on behalf of the corporation for whom the officer claims to act."[41]

---

[40] *See Callahan*, 302 Ga. App. at 887.

[41] *U.S. v. Bestfoods*, 524 U.S. 51, 70 n.13 (IV) (B) (1) (118 SCt 1876, 141 LEd 2d 43) (1998); *see also Raytheon Constructors, Inc. v. Asarco Inc.*, 368 F3d 1214, 1217 (II) (10th Cir. 2003) (noting that "dual officers can and do 'change hats' to

25

In the case most analogous to this one, *Corp. of Mercer University v. Barrett & Farahany, LLP*,[42] we held that documents created and maintained by a private college's campus police department were not subject to a GORA request when no public office or agency had "expressly requested" that the campus police perform a service or function on its behalf, even though campus police are given authority to perform certain functions by two Georgia statutes.[43] We explained that "[t]he [GORA's] statutory language simply does not provide this Court with the authority to compel entities that are private, but are granted the authority to perform public functions, to disclose their records."[44] And this Court further noted that "simply performing some task or function that has an indirect public benefit, or which aids the public as a whole, does not transform a private entity's records into public records."[45]

---

represent [ ] two corporations separately"); *Lusk v. Foxmeyer Health Corp.*, 129 F3d 773, 779 (III) (5th Cir. 1997) (noting the well-established principle of corporate law that directors and officers holding positions with a parent company and its subsidiary can and do "change hats" to represent two corporations separately).

[42] 271 Ga. App. 501 (610 SE2d 138) (2005), *superseded by statute on other grounds*.

[43] *See id.* at 503-04 (1) (a), 505 (1) (b).

[44] *Id. at* 505 (1) (b).

[45] *Id.*

Here, not only did the Authority never expressly request that Northside make the acquisitions on its behalf, the Authority was not even aware of the acquisitions until after they were completed. Moreover, the mere fact that Northside's healthcare operations and services may provide an indirect public benefit does not convert its private documents into public records absent any evidence that the documents relate to Northside's performance of a *specific* function on the Authority's behalf.[46]

In sum, Smith seeks documents related to commercial transactions between private entities, which the Authority had no knowledge, interest, or involvement in to any degree. Indeed, these acquisitions were negotiated and executed solely by Northside for its own private purposes, and it did not seek the Authority's approval or even inform the Authority of its plans in advance. Moreover, Smith presented no evidence that any public officials participated in the negotiations, and it was undisputed that no public funds were used to finance the acquisitions. Given these particular (and unique) facts and circumstances, the trial court was authorized to

---

[46] *See id.*

conclude that the documents specifically requested by Smith were not "public

documents" within the meaning of GORA.[47]

[47] *See Corp. of Mercer Univ.*, 271 Ga. App. at 505 (1) (b) (holding that a private college's campus police reports were not "public records" when no public office or agency expressly requested that the campus police perform a service or function on its behalf). *Cf. Macon Tel. Pub. Co. v. Bd. of Regents of Univ. Sys. of Ga.*, 256 Ga. 443, 444-45 (350 SE2d 23) (1986) (holding that documents maintained by a private athletic association affiliated with a public university were "public documents" when the president of the university was responsible for controlling the intercollegiate program, the athletic association was used by university officials to carry out that responsibility, and the requested documents were under a university official's direction and control); *United HealthCare of Ga., Inc.*, 293 Ga. App. at 88 (1) (holding that records of a private entity were "public records" when the relevant actions by that entity involved "current and future expenditure of substantial public funds," there was "significant" and "active" involvement of public officials, and the private entity was the "vehicle" or "management tool" through which the public agency had *chosen* to carry out the service or function on its behalf); *Cent. Atlanta Progress, Inc. v. Baker*, 278 Ga. App. 733, 735-38 (1) (629 SE2d 840) (2006) (holding that documents related to a bid for property by a private company were "public documents" under the Act when the bid was funded by "substantial public resources;" the city's mayor pledged to use tax allocation proceeds to fund the construction on the property; public officials and employees participated in the preparation and promotion of the bid; the bid was approved by various public officials; and winning the bid was "very important" to the State, City, and County); *Hackworth*, 214 Ga. App. at 19 (1) (a) (holding that personnel records of school bus drivers, who were employees of a private company that contracted with Atlanta's Board of Education to provide bussing services, were "public records" when student transportation was a "legitimate function" and the responsibility of the Board, the private company was a tool used by the Board to carry out this responsibility, maintaining personnel records regarding the hiring and management of school bus drivers was an "integral part" of the Board's public functions, and the Board had the right to approve the employment of all drivers or to cause the company to remove them); *Webb*, 218 Ga. App. at 94 (1) (holding that certain records of private

2. Smith also argues that the trial court erred in ordering a separate trial to determine whether the requested documents were exempt from GORA as trade secrets. However, given our holding in Division 1 *supra* (*i.e.*, that the trial court properly dismissed Smith's case because the requested documents are not "public records" within the meaning of the Act), the issue of whether the documents qualified for the trade-secrets exemption is moot.

*Case No. A15A2304*

3. In its cross-appeal, Northside argues that the trial court erred in precluding it from seeking information regarding the identity of the corporate client or clients for whom Smith initiated this action and the motive for doing so. However, given our holding in the primary appeal, affirming the trial court's dismissal of this case, Northside's cross-appeal, challenging a discovery ruling, is likewise moot.[48]

---

corporations were "public records" when those records remained in possession and control of a hospital authority, and there was a "sufficient basis to conclude that the private corporations functioned under the *direction and control* of the Authority to implement the Authority's duty to provide for the public health" (emphasis supplied)).

[48] *See Murray v. Ga. Dep't of Transp*., 284 Ga. App. 263, 272 (5) (644 SE2d 290) (2007) (dismissing the appellees cross-appeal when the trial court's judgment in the main appeal was affirmed).

For all of the foregoing reasons, we affirm the trial court's dismissal of Smith's GORA action in Case No. A15A2303, and in Case No. A15A2304, we dismiss Northside's cross-appeal as moot.

*Judgment affirmed in Case No. A15A2303. Appeal dismissed as moot in Case No. A15A2304. Ellington, P. J., Phipps, P. J., and Ray, J., concur. McMillian, J., concurs in judgment only. Barnes, P. J., and McFadden, J., dissent.*

A15A2303. SMITH v. NORTHSIDE HOSPITAL, INC. et al.

A15A2304. NORTHSIDE HOSPITAL, INC. et al. v. SMITH.

McFADDEN, Judge, dissenting.

I respectfully dissent. Because the Authority has certain official, governmental responsibilities, and Northside is the vehicle through which the Authority discharges those responsibilities, and Northside entered the transactions described in the documents at issue in the course of its discharge of those responsibilities, I would hold that those documents were indeed prepared and maintained or received by Northside on behalf of the Authority. And I would therefore hold that those documents are subject to the Open Records Act.

The lease-transfer agreement, as a matter of law, cannot shield those documents from the Open Records Act. And as a matter of fact, it does not attempt to shield them.

So I would reverse the trial court's holding that the records are not public records within the meaning of the Open Records Act. Consequently, I would reach two issues the majority does not. I would remand for the trial court to decide whether particular documents contain trade secrets and therefore fall within an exception to the Act. I would affirm the grant of the protective order.

1. *Public records.*

Hospital authorities "exercise public and essential governmental functions." OCGA § 31-7-75. So there is no question that the Authority's records are public records within the meaning of the Open Records Act. See *Cox Enterprises v. Carroll City/County Hosp. Auth.*, 247 Ga. 39, 45 (273 SE2d 841) (1981); OCGA § 50-18-70.

The Authority has chosen to discharge its "governmental obligation to provide for the health of the people . . . by the lease of the hospital" to Northside. *Richmond County Hosp. Auth. v. Richmond County*, 255 Ga. 183, 184 (1) (336 SE2d 562) (1985) (citation and punctuation omitted).

2

a. *As a matter of law*

Whether the documents at issue are likewise public records is answered by our holding in *Northwest Ga. Health System v. Times-Journal*, 218 Ga. App. 336 (461 SE2d 297) (1995). In that case, we held that the trial court was authorized to conclude that certain private, nonprofit corporations were "the vehicle through which the public hospital authorities carried out their official responsibilities. Consequently, despite [their] private, nonprofit status[,] . . . as vehicles for public agencies [they] were subject to the Open Meetings Act, and . . . documents [requested under the Open Records Act] were public records under the Open Records Act." Id. at 340 (1) (citation and punctuation omitted). Because Northside is the vehicle through which the Authority carries out its official responsibilities and, as discussed below, the documents at issue concern Northside's execution of that delegated responsibility, those documents are public records under the Open Records Act.

That holding in *Northwest Ga. Health System* has been approved by the General Assembly. In 1997 the General Assembly enacted OCGA § 14-3-305 to impose certain reporting and conflict-of-interest requirements on nonprofit corporations formed, created, or operated by or on behalf of a hospital authority. Subsection (e) of the statute provides,

3

> *[n]othing in this Code section shall* be deemed or construed to affect in any manner the provisions of Code Section 31-7-75.2 [an exemption in the Hospital Authorities Law to the Open Meetings Act and Open Records Act], Chapter 14 of Title 50 [the Open Meetings Act], or Article 4 of Chapter 18 of Title 50 [the Open Records Act] or to *change existing law as to whether such statutory provisions are applicable to nonprofits.*

OCGA § 14-3-305 (e) (emphasis supplied). (The term "nonprofits" as used in that statute "means any corporation which is formed, created, or operated by or on behalf of a hospital authority." OCGA § 14-3-305 (a).) Two years before OCGA § 14-3-305 was enacted, we held in *Northwest Ga. Health Systems* that the records of such nonprofit corporations were public records within the meaning of the Open Records Act. *Northwest Ga. Health System*, supra, 218 Ga. App. 336. "All statutes are presumed to be enacted by the legislature with full knowledge of the existing condition of the law and with reference to it." *Nuci Phillips Mem. Foundation v. Athens-Clarke County Bd. of Tax Assessors*, 288 Ga. 380, 383 (1) (703 SE2d 648) (2010) (citation and punctuation omitted).

Our decision in *Northwest Ga. Health System* rested on undisputed facts. And, as the majority observes, the relevant facts in this case are largely undisputed as well. We conduct a de novo review of the application of the law to the undisputed facts.

4

See *Maddox v. Schrader*, 268 Ga. 661 n. 3 (492 SE2d 521) (1997). Nothing in *Northwest Ga. Health System*, or any of the cases in its line, identifies any factors relevant here that would authorize a contrary result. See *United HealthCare of Ga. v. Ga. Dept. of Community Health*, 293 Ga. App. 84, 87-89 (1) (666 SE2d 472) (2008) (records of private companies, whose actions involved the expenditure of public resources, were public records because companies were vehicle through which state agency carried out its public function of administering state health insurance plan); *Corp. of Mercer Univ. v. Barrett & Farahany, L.L.P.*, 271 Ga. App. 501 (610 SE2d 138) (2005), superseded by statute on other grounds (documents created and maintained by private college campus's police department were not subject to Open Records Act because no public agency had expressly requested that the campus police perform a service or function on its behalf); *Dept. of Human Resources v. Northeast Ga. Primary Care*, 228 Ga. App. 130, 134-135 (4) (491 SE2d 201) (1997) (observing that Open Records Act has been applied to private entities when public agencies have delegated to them their official responsibilities and authority).

If – as the majority holds – Northside were not the vehicle through which the Authority carries out its official responsibilities, then the validity of the entire lease-transfer agreement would be in question. And if Northside were not the vehicle

5

through which the Authority discharges its responsibility "to provide for the health of the people," *Richmond County Hosp. Auth.*, 255 Ga. at 184 (1), then no one would be meeting that obligation. And if Northside were to stop providing those services, "the [Authority] would be required to step in to establish another method" for discharging its obligation. *Red & Black Publishing Co. v. Bd. of Regents*, 262 Ga. 848, 854 (3) (b) n. 13 (427 SE2d 257) (1993) (emphasis omitted).

In short, while the Authority was certainly free to delegate those responsibilities, it was not free to abdicate them. And, contrary to the majority, the terms of the lease-transfer agreement repeatedly make very clear that it is not an attempt to abdicate them.

b. *Terms of the lease-transfer agreement.*

In support of its conclusion that Northside has no responsibility under the terms of that agreement to act for the public good or as a vehicle to carry out the Authority's official responsibilities, the majority relies on two provisions of the lease-transfer agreement: (1) that Northside would use "the Operating Assets and Existing Operations so transferred to it in the operation of the Leased Facilities and in furtherance of Northside's purposes as set forth in its Articles of Incorporation and

6

as otherwise permitted by [the] Agreement;" and (2) that Northside would "have sole and exclusive charge of the operation of the Leased Facilities."

But the lease-transfer agreement and Northside's articles of incorporation show that the responsibilities Northside has undertaken are much broader than that. As to the first of those provisions, the lease-transfer agreement does provide that Northside was to operate the leased facilities "in furtherance of [its] purposes." But it specifies that those purposes are "set forth in its Articles of Incorporation" – not the bylaws as the majority implies. And the relevant provision of Northside's articles of incorporation, which is set out in the margin,[1] simply states that its corporate purpose is "to operate, directly or indirectly, health care facilities *for the benefit of the general public. . . .*" (Emphasis supplied.) This, of course, is precisely in line with the Authority's delegation of its governmental obligations to Northside.

---

[1]"The purposes of the corporation are to operate, directly or indirectly, health care facilities *for the benefit of the general public* and, specifically, to own, lease, and operate hospitals, clinics, and other health care facilities, to provide hospital and medical care and related functions, and generally to undertake and perform all other activities necessary, incidental, useful, or advisable, directly or indirectly, to the foregoing including the exercise of all other powers and authorities permitted for the corporation by the Georgia Nonprofit Corporation Code, subject to the limitations of Section 501 (c) (3) of the Code." (Emphasis supplied.)

Further, the lease-transfer agreement describes the Authority's stated intent in leasing to Northside a facility composed of a hospital, a surgery center, and two office buildings for $100,000 per year, as to "promote the public health needs of the community by making additional facilities available in the community," "by lowering the cost of health care in the community," and by "seiz[ing] available opportunities both within and outside Fulton County." As discussed below, at the end of the lease term, those "seize[d] opportunities" become the property of the Authority. The transactions reflected in the documents at issue, acquisition of the four physician practices, furthers the Authority's stated goal of "seize[ing] available opportunities." Consequently, Northside's acquisition of those practices is on behalf of the Authority and the documents related to those acquisitions are public records.

As to the second of those provisions, the agreement does indeed provide that Northside has "the power and authority to stand in the place of the Authority" and that the parties intend that the Authority's "grant of powers and authority shall be broadly construed and that Northside shall have full power to act for the Authority, in the Authority's name, place and stead in any and all circumstances." Indeed, as the majority points out, the Authority retained only limited duties and powers under the lease. It necessarily, then, delegated to Northside the remainder of its powers and

8

responsibilities so as to satisfy its governmental obligation. But contrary to the majority what that means is that the lease-transfer agreement, in its parts and as a whole, sets out an express intent to make Northside the entity to which the Authority delegated its governmental responsibilities and authority. It is the vehicle through which the Authority acts.

That intent is reaffirmed in other provisions of the lease-transfer agreement. The agreement ensures that the Authority retains sufficient control over the hospital to satisfy the requirements of the Hospital Authorities Law. A provision of that law, OCGA § 31-7-75 (7), requires that, before a hospital authority enters a lease arrangement like the one at issue here, it must "first determine[] that such lease will promote the public health needs of the community." And a hospital authority is required by that same subsection to "retain[] sufficient control" over the project to ensure that the lessee obtains no more than a reasonable rate of return on its investment. Id.

The lease-transfer agreement further provides that the operating assets, which include all subsequent accumulations by Northside, presumably including the acquisitions at issue here, will revert to the Authority at the end of the lease. It even contemplates a method of disposing of Northside assets that the Authority cannot

9

legally hold: Northside will dispose of such assets according to the Authority's direction, with the proceeds reverting to the Authority.

And the lease-transfer agreement expressly provides that Northside stands in the place of the Authority and that the agreement was intended to "promote the public health needs of the community."

Those express acknowledgments of Northside's public purpose defeat the majority's attempt to distinguish *Northwest Ga. Health Systems* on the basis of language in the corporate bylaws at issue in that case, which provided that the nonprofit corporation there was organized "for the benefit of, to perform the functions of, or to carry out the purposes of" the involved hospital authorities. *Northwest Ga. Health Systems*, 218 Ga. App. at 337. Moreover the language the majority cites was but one factor the *Northwest Ga. Health Systems* court considered in determining that the trial court was authorized to find that the nonprofit corporation in that case was the vehicle through which the authorities acted.

The majority also attempts to distinguish *Northwest Ga. Health Systems* on the ground that the case concerned only certain, particular documents. But that opinion was not so narrow. It did not describe or distinguish among documents requested, and its analysis did not turn on the scope or nature of the documents requested.

10

Another fact supporting the conclusion that Northside is performing a service or function on behalf of the Authority is that the Authority has placed a valuable public asset into Northside's hands – the leased premises. In *United HealthCare of Ga, supra,* 293 Ga. App. at 88 (1), we concluded that the records of certain private companies were public records because the companies were the vehicle through which a state agency carried out its public function of administering the state health insurance plan, which involved the expenditure of public funds. When a public agency has entrusted a private entity with public resources, we held, that fact is at least some indication that the private entity is performing a public-agency function.

The trial court here focused on what she perceived to be the lack of evidence that the Authority was involved in "the transactions at issue in this case." But the *Northwest Ga. Health System* court looked to the overall nature of the relationships between the hospital authorities and the private, nonprofit corporations, not to any particular transactions. Contrary to the majority's characterization, I would not decide that "*all* of a *Richmond* hospital's documents are public records" for purposes of the Open Records Act. It is unnecessary to reach such a sweeping construction in this case, because here it is abundantly clear that Northside entered the four transactions on behalf of the Authority, and the documents related to those transactions are

11

therefore public records. And while I would hold that these documents are public records within the meaning of the Open Records Act, I would also hold, as detailed in Division 2 of this dissent, that the case must be remanded for the trial court to determine whether the documents are subject to an exception to the Act. See OCGA § 50-18-72, which sets out a long list of statutory exceptions to the Open Records Act.

The case that the majority relies on as most analogous to the instant case does not support its position. See *Corp. of Mercer Univ.*, supra, 271 Ga. App. at 501. In that case, as the majority describes, we held that documents created and maintained by a private college campus's police department were not subject to the Open Records Act because no public agency had expressly requested that the campus police perform a service or function on its behalf. Here, on the other hand, the Authority expressly delegated its governmental obligations to Northside, in part to enable it "to seize available opportunities," such as the four acquisitions at issue. The relevance of *Corp. of Mercer Univ.* is that we found the Act not applicable when, unlike here, the private entity did not carry out "some public purpose at the express request of a public office or agency." Id. at 505 (1) (b).

For these reasons, consistent with the General Assembly's declaration in the Open Records Act that it is "the strong public policy of this state . . . that public access to public records should be encouraged," OCGA § 50-18-70 (a), I would conclude that the documents Smith requested are public records within the meaning of the Act.

I acknowledge that Northside has made countervailing policy arguments: that subjecting entities like Northside to the Open Records Act would prevent them from competing effectively in the marketplace and that counties should be permitted, if not encouraged, to get government out of the healthcare business. But Northside's policy arguments should be addressed to the General Assembly. We have neither the institutional competence to properly evaluate them nor the legitimate authority to subordinate to them the policy announced by the General Assembly in the text of the Open Records Act.

2. *Trade-secrets exception.*

Whether the requested documents are exempted from disclosure under a trade-secrets exception to the Open Records Act, see OCGA §§ 50-18-72 (a) (34), 31-7-75.2, remains for resolution. Smith argues that the trial court erred in ruling that Northside is entitled to a trial on its claim of exemption. But he did not seek a pretrial

13

resolution of the exemption issue, and the trial court issued no ruling denying such a motion. So this enumeration presents nothing for review. See *Matthews v. Tele-Systems*, 240 Ga. App. 871, 875 (5) (525 SE2d 413) (1999) ("[T]here is no order from which to appeal. Thus, there is nothing for us to review.") (citation omitted); *McDaniel v. State*, 221 Ga. App. 43, 46 (1) (470 SE2d 719) (1996) (this court "has no jurisdiction to address issues . . . raised for the first time on appeal") (citation omitted).

3. *Protective order.*

Northside appeals the trial court's grant of Smith's motion for a protective order prohibiting any discovery concerning the identity of Smith's clients or their purpose in bringing the action. "It is well settled that the conduct of discovery is within a trial court's broad discretion." *Exxon Corp. v. Thomason*, 269 Ga. 761, 763 (3) (504 SE2d 676) (1998) (citations omitted). And "[u]nless the trial court has clearly abused [that] discretion, . . . we will defer to [her] conclusion about whether a protective order should be granted." *Norfolk Southern R. v. Hartry*, 316 Ga. App. 532, 534 (729 SE2d 656) (2012) (citation omitted).

Northside argues that the information it seeks is relevant to its argument that the records Smith requested are trade-secrets exempt from the Open Records Act. It

14

elaborates that the information it seeks would show that Smith's client is a competitor that sought the documents for competitive purposes, thus supporting its contention that the documents are protected by the trade-secrets exemption of the Open Records Act.

At the hearing on the motion for protective order, Northside conceded that it has other ways of establishing that the documents are trade secrets, and, in fact, contended that it already had done so. And Smith's counsel conceded at oral argument before this court that, for purposes of analysis of the scope of the applicability of the Open Records Act, Northside is entitled to the benefit of the assumption that Smith's client is a competitor.

At the time the trial court entered the protective order, she already had dismissed Northside's counterclaim, which she characterized as asserting claims for "unfair competition, interference with contractual relationships, interference with ongoing and prospective business relationships, attempting to obtain business secrets under false pretenses, and pursuing a sham, false, and frivolous lawsuit in order to gain unfair and improper competitive advantage." She held that "[s]uch claims necessarily involve the intentions, purposes, and motivations behind [Smith's] current action seeking enforcement of the Open Records Act," and that allowing the

15

counterclaims to proceed would have a "chilling effect" and "would circumvent well-established public policy in favor of open government."

A trial court may prevent the "use of discovery which is oppressive, unreasonable, unduly burdensome or expensive, harassing, harsh, insulting, annoying, embarrassing, incriminating, or directed to wholly irrelevant and immaterial or privileged matters or as to matter concerning which full information is already at hand." *Sechler Family Partnership v. Prime Group*, 255 Ga. App. 854, 857 (2) (567 SE2d 24) (2002) (citation omitted). Compare *Galbreath v. Braley*, 318 Ga. App. 111, 112-113 (733 SE2d 412) (2012) (reversing grant of protective order that prohibited litigant from conducting discovery "necessary" to his case).

Under these facts, Northside has not shown that the trial court abused her discretion.

I am authorized to state that Presiding Judge Barnes joins in this dissent.