## 42571, 42670. RICHMOND COUNTY HOSPITAL AUTHORITY et al. v. RICHMOND COUNTY et al. (two cases).
### (336 SE2d 562)

MARSHALL, Presiding Justice.

The Richmond County Hospital Authority (the Authority) is a governmental entity which was created in 1960 by resolution of the Board of Commissioners of Richmond County, pursuant to the Hospi-

---

tal Authorities Act (OCGA § 31-7-70 et seq.; Ga. L. 1964, p. 499), to operate the University Hospital as a public facility in Richmond County.

In 1984, the Authority approved a restructuring of the hospital, whereby it was leased for 40 years, pursuant to OCGA § 31-7-75 (7), for operation by four private corporations which were formed: University Health Services, Inc., the nonprofit lessee; University Health, Inc., the nonprofit holding company; University Extended Care, Inc., the nonprofit sublessee of University Health Services, Inc., for the operation of the extended-care facility; and University Health Resources, Inc., the profit corporation to conduct health-care activities. By its terms, the lease became effective on February 1, 1985.

On February 19, 1985, Richmond County, by five of the six members of the Richmond County Board of Commissioners, brought this action against the Authority and the four private corporations to declare the lease null and void, and to enjoin its further implementation. The Authority appeals from the judgment adverse to it (Case No. 42571) and from the denial of its motion to amend the findings of fact and conclusions of law, and for a new trial (Case No. 42670). We reverse.

1. The appellees contend that the lease of the hospital was not a valid exercise of the Authority's power under the Hospital Authorities Act, supra. In *Bradfield v. Hosp. Auth. of Muscogee County*, 226 Ga. 575, 583 (1) (176 SE2d 92) (1970), this court, in upholding the lease of an authority hospital to a private nonprofit corporation, held: "Under the Hospital Authorities Law, this governmental obligation [to provide for the health of the people] can be discharged . . . by the . . . lease of the hospital to others . . . (as well as by the Hospital Authority's operation thereof). [OCGA § 31-7-75.] There is no apparent reason why a suitable private corporation could not properly operate the hospital, either as lessee or as owner, so as to likewise promote the public health functions of government."

Here, following the holding in *Bradfield*, supra, a lease was made to a nonprofit corporation which must continue University Hospital operations in the same manner as they now exist: nonprofit and for the benefit of the community. While the technique of a lease to a corporation organized at the instance of the Authority was not addressed in *Bradfield*, it follows legally sound principles which come from the statute and decisions of this court. As stated in 1938, when an unsuccessful challenge was made to the legality of the Augusta Housing Authority: " 'A legislative project of this nature goes beyond anything heretofore attempted in this State. It naturally invites, therefore, the attack of those who are inclined to regard all experiments in our social and economic life as presumptively unconstitutional. Such challenges must fail, however, if upon analysis it appears

that the only novelty in the legislation is that approved principles are applied to new conditions. Neither our State nor our Federal constitution forbids changes, merely because they are such, in the nature or the manner of use of methods designed to enhance the public welfare; they require only that the new weapons employed to combat ancient evils shall be consistent with the fundamental scheme of government of the commonwealth and the nation, and shall not violate specific constitutional mandates.' " *Williamson v. Housing Auth. of Augusta*, 186 Ga. 673, 693 (199 SE 43) (1938). OCGA § 31-7-96 provides: "This article, being necessary for the welfare of the citizens of the state, shall be liberally construed to effect the purposes hereof; and insofar as this article may be inconsistent with any other law, whether by charter of any political subdivision of the state or otherwise, this article shall be controlling."

The appellees raise several arguments against the lease. Their allegation that the lessee can engage in joint ventures for purposes unconnected with health care, overlooks the facts that the articles of incorporation clearly restrict the operations of University Health Resources, Inc., to health-related activities, and that the type ventures mentioned by the appellees would violate the nonprofit character of the lessee's articles of incorporation if undertaken by the lessee. The alleged inadequacy of the consideration for the lease ($1, an agreement to provide indigent care, and an agreement to furnish annual reports) fails to take into account the lessee's agreements, inter alia, to operate the hospital for the public benefit on a nonprofit basis; to maintain the hospital; to provide emergency treatment; to set rates using the same nonprofit criteria applicable to hospital authorities (thus not an improper delegation of the Authority's right to fix rates and charges); to provide ambulance services; and to assume a significant indigent-care burden, plus many millions of dollars in operating liabilities. The appellees' implication — that the hospital was built solely with county funds and that the taxpayers have paid for all of its existing structures — fails to recognize that most of the money for the hospital came from the proceeds of three revenue anticipation certificates issued by the Authority (in 1966, 1967 and 1977); that these issues have been defeased by the Authority, resulting in a direct savings to the taxpayers; that, prior to defeasance, the county paid only approximately one half of the principal of the first two issues and none of the last one, which was the largest of the three; that other non-county monies were involved in the construction of the hospital; and that the Authority was not required to defease a previous (1963) bond issue in order to lease the hospital.

(a) The superior court held that there was no lease to "others," as required by OCGA § 31-7-75 (7), supra, because: the lease is to a corporation created at the direction of the Authority, the incorporator of

the defendant corporations is also the attorney for the Authority, the Authority expended its funds to create the corporations, and there are Authority members serving on the board of trustees. This holding overlooks the principle that corporations are separate and distinct entities in the eyes of the law, notwithstanding even common ownership of two corporations and the relationship of one corporation as the wholly-owned subsidiary of another. *Williams Plaza v. Sedgefield Sportswear Div.*, 164 Ga. App. 720 (297 SE2d 342) (1982); *Collins v. Booker*, 129 Ga. App. 824, 825 (1) (201 SE2d 676) (1973).

(b) OCGA § 31-7-75 (7) authorizes leases by the authority, with one proviso being "that the authority shall have retained sufficient control over any project so leased so as to ensure that the lessee will not in any event obtain more than a reasonable rate of return *on its investment in the project*, which reasonable rate of return, if and when realized by such lessee, shall not contravene in any way the mandate set forth in Code Section 31-7-77 specifying that no authority shall operate or construct any project for profit." (Emphasis supplied.)

The appellees contend that this provision *requires* that the lessee make an investment. However, the term "its investment" is relevant only insofar as it contributes to the measurement of the "reasonable rate of return" which § 31-7-75 (7) indicates may be earned by a proprietary corporation or other person which or who is not legally prohibited from enjoying a personal profit or private inurement. The lessee, not being such a proprietary corporation, is untouched by the concept of reasonable rate of return and the investment which contributes to the measurement of such reasonable rate. Furthermore, the statutory language in question does not require an "investment"; it simply indicates that if an investment is made in connection with the lease, the rate of return will be limited to that which is reasonable.

(c) OCGA § 31-7-75 (7) authorizes the lease of a project "provided that *the authority* shall have first determined that such lease will promote the public health needs of the community by making additional facilities available in the community or by lowering the cost of health care in the community . . ." (Emphasis supplied.) In those situations wherein the legislature has conferred on other governmental entities the right and duty to make certain decisions, this court has consistently ruled that the courts of this state must not interfere with such decisions as made unless a governmental unit in question clearly abused its discretion. *Chatham County v. Mulling*, 248 Ga. 878 (286 SE2d 735) (1982); *City of Atlanta v. Wansley Moving &c. Co.*, 245 Ga. 794 (267 SE2d 234) (1980); *Smith v. Bd. of Commrs.*, 244 Ga. 133 (259 SE2d 74) (1979); *Cobb County &c. Hosp. Auth. v. Prince*, 242 Ga. 139 (249 SE2d 581) (1978); *Charles v. Cobb*

*County,* 231 Ga. 696 (203 SE2d 503) (1974). In the *Prince* case, 242 Ga. 139, supra, p. 146, we made very clear in a hospital-authority setting that, with respect to a certain resolution adopted by a hospital authority in furtherance of the administration, operation, maintenance and control of the hospital, this court's function was restricted to a determination of whether the hospital authority's action in adopting such resolution was arbitrary and unreasonable.

The lower court made no finding of an abuse of the Authority's discretion, but rather sought to substitute its judgment on the health needs of the community for that of the Authority. Furthermore, the finding that the lease would not benefit the public was not authorized by the evidence, as discussed in Div. 2 (a), post.

(d) One ground of the lower court's rejection of the lease agreement was that the transfer of significant amounts of cash and accounts receivable was not a proper subject of a lease, and that the Authority was not adequately protected.

Cash is an asset, and can be transferred, just as an operating-room table, for instance. Under the lease agreement, the cash, accounts receivable and other personal property are conveyed in fee rather than leased, because of the lessee's need to have the freedom to utilize, dispose of, and replace such property during the 40-year term of the lease. The Authority is protected by the reversionary clause in the lease. "Project," which is subject to lease under the terms of OCGA § 31-7-75 (7), is defined in § 31-7-71 (5) to include "all utilities and *facilities* deemed by the authority *necessary or convenient* for the efficient operation thereof." (Emphasis supplied.) Almost no asset could be more "necessary and convenient" to the operation of a hospital than cash or accounts receivable. "The word 'facility' ('facilities' plural) as defined in Webster's Third New International Dictionary, Unabridged (1961), page 812, means something that is built or installed to perform some particular function but it also means *something that promotes the ease of any action or course of conduct.* It is our view that the facilities mentioned need not necessarily be provided in the hospital building or on the premises on which the hospital building is located, but *may be provided by contractual arrangements . . .*" (Emphases supplied.) *Raynor v. American Heritage Life Ins. Co.,* 123 Ga. App. 247, 249 (180 SE2d 248) (1971), cert. den. The Authority is authorized to sell or lease "facilities" (OCGA § 31-7-75 (6)) and to "exchange, *transfer, assign,* pledge, mortgage, or *dispose of* any real or *personal property or interest therein."* (Emphases supplied.) OCGA § 31-7-75 (14). Cash and accounts receivable are personal property. *Coursey v. Curtis,* 18 Ga. 237 (1855); OCGA § 11-9-106. Additionally, the Authority can "exercise any or all powers now or hereafter possessed by private corporations performing similar functions." OCGA § 31-7-75 (21).

OCGA § 31-7-75 (8) extends to hospital authorities the power "[t]o extend credit or make loans to others for the . . . carrying out of any project, which credit or loans may be secured by such loan agreements, mortgages, security agreements, contracts, or other instruments or fees or charges, for a term not to exceed 40 years, and upon such terms and conditions *as the authority shall determine reasonable* in connection with such loans, including provisions for the establishment and maintenance of reserves and insurance funds, and in the exercise of powers granted by this Code section in connection with a project, to require the inclusion in any contract, loan agreement, security agreement, or other instrument such provisions for guaranty, insurance, construction, use, operation, maintenance, and financing of a project *as the authority may deem necessary or desirable.*" (Emphases supplied.) The term "loan" connotes a temporary use. Although that portion of the lease relating to the transfer of cash and accounts receivable to the lessee is not expressed in customary lending language, in the normal course of events and guided and enforced by the specific covenants of the lease relating to the use of transferred assets and the operation of the project, there exists a reasonable expectation that assets in the form of cash and accounts receivable will be permanently returned to the Authority when the term of the lease has expired, as the lease requires. As for the concern that the cash is not adequately protected under the lease agreement, it should be noted that the lessee assumed $131,592,627 in liabilities. Under cases exemplified by those cited in Div. 1 (c), supra, the court may not substitute its business judgment for that of the Authority.

(e) It is contended that the members of the Authority breached fiduciary duties owed to the Authority (e.g., to determine whether the lease would promote the public-health needs of the community) when they leased the hospital, without arm's-length negotiations, to themselves (i.e., to corporations on which some of the Authority members served).

This contention overlooks the fact that the Authority, in the exercise of its duties to the public, prepared the lease, which requires the lessee to operate the hospital on the same financial basis as the Authority would operate it, and provides that all assets of the corporations, from whatever source derived, will revert to the Authority at the end of the lease. The evidence is overwhelming that the Authority members faithfully performed their duties to the Authority and secured the best possible arrangement. It is significant that the superior court did not conclude that there was a conflict of interest in this situation. OCGA § 31-7-74 (b) specifies that the conflicts-of-interest rules are applicable to hospital authority members. That statute focuses the conflicts-of-interest analysis on whether the authority member has a financial interest in the transaction in question.

Hospital Authority members are, of course, public officers, and as such are further restrained by the provisions of Art. I, Sec. II, Par. I, Constitution of Georgia of 1983, which provides: "Public officers are the trustees and servants of the people and are at all times amenable to them." These two considerations are sufficient, we believe, to safeguard against prohibited conflicts of interest, inasmuch as no Authority member who serves on the board of the lessee and the other corporations is permitted to obtain any financial benefit, either directly through compensation or indirectly through dealings with the corporations. See *City of Macon v. Huff*, 60 Ga. 221 (1878), wherein this court voided a contract for the performance of certain services which was entered into between the mayor of Macon, individually, and the City of Macon. We held: "The fundamental principle which will be found to underlie all adjudications made in this state on similar questions, and which, we think, has not been upset by any well considered case anywhere, is that no officer or agent, public or private, whose duty it is to supervise a contract in behalf of his employers or principal, can himself undertake to do that thing which his office or agency makes it his duty to supervise for others, and to see to it for them that it is well and faithfully done. The reason is too plain and palpable for serious dispute. The man becomes a judge in his own case. He agrees to perform work himself, and yet is to judge whether or not it is well done." 60 Ga. at 224. "It matters not how fair the contract may be; public policy will not uphold it. This principle is iterated and reiterated everywhere in the books." Id. at 226.[1]

With regard to the effect of the lack of bargaining on the determination of benefit to the public health, OCGA § 31-7-75 (7) makes this a decision to be made by the Authority alone, not one to be negotiated with other parties. Nor does the fact that Authority members act on the defendant corporations' boards breach their fiduciary duties or create a conflict of interest; they do so, not in conflict with their duties to the Authority, but solely to ensure that the hospital is operated in accordance with the lease and to ensure benefit to the public.

(f) Finally, the superior court struck down the lease on the basis that it was motivated by an impermissible intent to operate outside of Richmond County.

OCGA § 31-7-71 (1) provides that the "area of operation" of a

---

[1] More recently, we have dealt with other concerns relative to conflicts of interest in *Dept. of Transp. v. Brooks*, 254 Ga. 303 (328 SE2d 705) (1985); *Wyman v. Popham*, 252 Ga. 247 (312 SE2d 795) (1984); *Dunaway v. City of Marietta*, 251 Ga. 727 (308 SE2d 823) (1983); *Stephenson v. Benton*, 250 Ga. 726 (300 SE2d 803) (1983); *Ga. Dept. of Human Resources v. Sistrunk*, 249 Ga. 543 (291 SE2d 524) (1982). See also *Young v. Champion*, 142 Ga. App. 687 (236 SE2d 783) (1977).

hospital authority "means the area *within the city or county activating an authority.*" (Emphasis supplied.) OCGA § 31-7-86 provides: "Any property conveyed or leased to an authority by cities or counties shall be operated by the authority to which the same is conveyed, together with other facilities of the authority, *in accordance with this article and the resolution of the governing body or bodies or participating units.*" (Emphasis supplied.) The resolution creating the Richmond County Hospital Authority provided that "the area of operation of the Richmond County Hospital Authority be and is hereby defined as including all of the territorial limits and affecting all of the citizens *within the limits of the boundary of said County.*" (Emphasis supplied.)

The requirement that the Authority operate within Richmond County is subject to the provisions of OCGA § 31-7-75 (24), which gives the Authority the powers "[t]o provide management, consulting, and operating services including, but not limited to, administrative, operational, personnel, and maintenance services to another hospital authority, hospital, health care facility, as said term is defined in Chapter 6 of this title, person, firm, corporation, or any other entity or any group or groups of the foregoing, to enter into contracts alone or in conjunction with others to provide such services *without regard to the location of the parties to such transactions*; to receive management, consulting, and operating services including, but not limited to, administrative, operational, personnel, and maintenance services from another such hospital authority, hospital, health care facility, person, firm, corporation, or any other entity or any group or groups of the foregoing; and to enter into contracts alone or in conjunction with others to receive such services without regard to the location of the parties to such transactions." (Emphasis supplied.)

Thus, even the Authority itself is given power to contract to provide management, consulting, and operating services (not limited to a broad category of specified services) to a virtually unlimited classification of other entities, *without regard to the location of the parties to such transactions.* Under our holding in Div. 1 (b), ante, the Authority could lease the hospital to a proprietary or for-profit corporation, such as a hospital chain, which may own or operate hospitals not only in this state but in other states as well. We see nothing to prohibit such lease as long as the lease complies with the statutory stipulations, such as the promotion of the public-health needs of the community and the operation of the project with a reasonable rate of return, to comply with the mandate of OCGA §§ 31-7-75 (7), 31-7-77 that the projects not be operated for profit. Therefore, the lease is not invalid per se merely because it enables operation of projects outside the Authority's "operation area." A remedy for any perceived violation of the lease or the Hospital Authorities Act is injunction of such

impending violation.

2. Findings of fact of a court sitting without a jury are not to be disturbed on appeal unless clearly erroneous. OCGA § 9-11-52 (a). The "clearly erroneous" standard requires reversal of a trial court's findings of fact if there is no evidence to support them. *Wolfe v. Rhodes*, 166 Ga. App. 845, 847 (305 SE2d 606) (1983) and cits.

(a) There was no evidence that the lease will not promote the community's public-health needs. The extensive evidence to the contrary is summarized as follows: A hospital must attract private paying patients or else it will become a deficit-ridden, indigent-only hospital, dependent upon tax dollars to keep its doors open. The private paying patient is often located outside the bounds of Richmond County, and innovative health-care delivery systems are needed to attract these patients and their dollars to University Hospital. Maintaining physicians on the staff of University Hospital is essential to retaining a private-paying-patient base and ensuring the continued viability of the hospital. Joint ventures with physicians of University Hospital, permissible under the lease, are essential to maintaining the loyalty of such physicians. Joint ventures with physicians in health care, permissible under the lease, would allow the development of additional health-care facilities without the need to raise all of the capital in the public sector, thereby saving taxpayer dollars. Under the lease, health-care-related activities which would endanger the tax-exempt status can be performed by the defendant corporations to raise funds to offset the cost of indigent care. Under the lease, the structure of the hospital can be arranged so as to maximize the amount of Medicare/Medicaid funds received, thereby lowering the cost of health care to the community. The certificate of need was approved by the State Health Agency. The hospital, as leased, would be in a better position to serve the public-health needs of the community than when operated by the Authority.

The only evidence upon which the plaintiffs-appellees rely is criticisms of the proposed transaction by a grand-jury committee, to which the Authority responded by making significant changes in the lease, including a requirement to comply with both Georgia's open-records and open-meetings laws (OCGA §§ 50-18-70; 50-14-1).

(b) The superior court's finding — that the Authority refused to comply with an order of that court regarding disclosure of salaries, by appealing to this court (*Richmond County Hosp. Auth. v. Southeastern Newspapers Corp.*, 252 Ga. 19 (311 SE2d 806) (1984)) — denigrates this court's position as an appellate court and misconstrues the legitimate acts of the Authority, which, like all citizens, has a right to appeal vital questions of state law. A valid appeal of a trial court's order is in no way a refusal to comply with that order.

(c) The superior court found that one of the major reasons for

the lease of the hospital was to evade and avoid the provisions of the open-records and open-meetings (or sunshine) laws, supra. The only contended factual support for this finding of fact was the formation of the restructure committee after the trial court judge and this court ruled on the Open Records Act controversy, and the fact that the lease as originally approved did not address the two aforementioned Acts. However, the *study* of restructuring began in 1981, and the salary dispute did not arise until 1983. To presume merely from these facts that the Authority members were intending to circumvent the law, violates the well settled principle that public officials shall be presumed to have performed their duties and acted in good faith unless clearly proven otherwise. *McDowell v. Judges ex Officio*, 235 Ga. 364 (219 SE2d 713) (1975); *Colonial Dairies v. City of Albany*, 209 Ga. 791 (75 SE2d 809) (1953); *Jarrett v. City of Boston*, 209 Ga. 530 (74 SE2d 549) (1953). The fact that the Authority litigated this case after imposing the two referred-to statutes on the defendant corporations via the lease, illustrates that the motivating factors for the lease were not the evasion of the law, but the economic conditions in the health-care marketplace and the advantages that the lease will give to the hospital.

3. The plaintiffs-appellees, as a political subdivision of the state, are not barred by equitable estoppel or laches from challenging the lease. *Richmond County v. Pierce*, 234 Ga. 274, 278 (4) (215 SE2d 665) (1975) and cits.

4. The trial court did not err in advancing and consolidating the trial of the action on the merits with the hearing on the appellees' application for an interlocutory injunction without prior notice to the parties, where the parties waived this by briefing the issues delineated by the trial judge without objecting to the judge's hearing the merits of the case. *Wilkerson v. Chattahoochee Parks, Inc.*, 244 Ga. 472 (2) (260 SE2d 867) (1979).

5. In view of our reversal of the judgment in this case, it is unnecessary to rule upon the appeal in Case No. 42670.

*Judgment reversed. All the Justices concur, except Hill, C. J., who concurs in the judgment only.*

DECIDED NOVEMBER 21, 1985.

*Knox & Zacks, Wyckliffe A. Knox, Jr., Patricia Warren Booker, Ted H. Clarkson,* for appellants.

*Robert C. Daniel, Jr.,* for appellees.

*Reinhardt & Whitley, Bob Reinhardt, James F. Grubiak, Hunter, Maclean, Exley & Dunn, Malcolm Maclean, Roland B. Williams, Wade W. Herring II, Alston & Bird, G. Conley Ingram, Jack Spalding Schroder, Jr., Barnes, Browning, Tanksley, Carr &*

*Casurella, Roy E. Barnes, Thomas J. Casurella, Jeffrey G. Casurella,* amici curiae.