

## SUPREME COURT OF GEORGIA

Atlanta        November 2, 2017

The Honorable Supreme Court met pursuant to adjournment.

The following order was passed:

It appearing that the enclosed opinion decides a second-term appeal, which must be concluded by the end of the August Term on November 18, 2017, it is ordered that a motion for reconsideration, if any, including any motions submitted via the Court's electronic filing system, must be **received** in the Clerk's Office **by 10:00 a.m. on Thursday, November 9, 2017.**

SUPREME COURT OF THE STATE OF GEORGIA

Clerk 's Office, Atlanta

I certify that the above is a true extract from the minutes of the Supreme Court of Georgia.
Witness my signature and the seal of said court hereto affixed the day and year last above written.

_____, Clerk

In the Supreme Court of Georgia

Decided: November 2, 2017

S16G1463.  SMITH v. NORTHSIDE HOSPITAL, INC. et al.

PETERSON, Justice.

A government agency owns and operates a large and complex hospital as part of its mission to provide healthcare throughout Fulton County. Perhaps concerned that providing healthcare might not be the sweet spot of government competence, the agency decides that a private, nonprofit corporation should be created to do it instead. The agency leases its considerable assets (including the hospital) to the newly-created corporation for 40 years at a relatively minimal rent, and delegates to the corporation nearly all of its governmental powers and responsibilities. The corporation's organizing documents reflect that its purpose aligns very well with the agency's: to provide healthcare for the benefit of the public.

Thirty years later, the corporation has become massive, with considerable assets in surrounding counties. With the agency barely even a dwindling dot in the rear-view mirror, the corporation now argues that it doesn't really do

anything on behalf of the agency (in part because the now nearly-nonexistent agency has no idea what the corporation is doing), and thus the corporation's records of a series of healthcare-related acquisitions aren't subject to public inspection. If the corporation's aggressive position were wholly correct, it may well cast serious doubt on the legality of the whole arrangement between the corporation and the agency. A lawyer who seeks records from the corporation under this state's sunshine laws, on the other hand, takes the opposite (but equally aggressive) position, contending that everything the corporation does is for the agency's benefit and thus all of its records are public. Both are wrong. The corporation's operation of the hospital and other leased facilities is a service it performs on behalf of the agency, and so records related to that operation are public records. But whether the acquisition-related records sought here are also public records depends on how closely related the acquisition was to the operation of the leased facilities, a factual question for the trial court to determine on remand.

E. Kendrick Smith, an Atlanta lawyer, brought this action to compel the corporation — Northside Hospital, Inc. and its parent company, Northside Health Services, Inc., (collectively, "Northside") — to provide him with access

2

to certain documents in response to his request under the Georgia Open Records Act ("the Act"). The trial court dismissed Smith's action after a bench trial, and a divided Court of Appeals affirmed. Smith v. Northside Hosp., Inc., 336 Ga. App. 843 (783 SE2d 480) (2016). We granted certiorari to consider whether the lower courts erred in concluding that the documents in question were not "public records" within the meaning of the Act. After oral argument and considerable briefing, we conclude that the Court of Appeals and trial court applied the wrong legal standard, reverse the opinion of the Court of Appeals, and remand the case for the trial court to apply the correct legal standard.

The facts relevant to this appeal are largely undisputed. In 1966, the Commissioners of Roads and Revenues of Fulton County passed a resolution creating the Fulton County Hospital Authority (the "Authority"), which would "have and exercise all of the powers granted and prescribed in the Hospital Authority Laws." The Authority was created because of the need in Fulton County for improved and increased hospital facilities to serve the community. And to that end, the Authority opened Northside Hospital, which it owned and operated for approximately the next 25 years. In the early 1990s, the Authority, recognizing "the rapidly changing healthcare environment in which it

operate[d]," undertook a study to determine how best to improve the hospital's operations. Ultimately, the Authority concluded that the best option to achieve its goals was to restructure through a long-term lease of the hospital and related assets for operation by a private, charitable, nonprofit corporation. The Authority further determined that "[r]ecent developments and opportunities affecting the ability of the [h]ospital to remain competitive and to enhance its position as a principal provider of specialty healthcare services . . . reinforced the importance of restructuring to the long term competitive position of the [h]ospital."

Based on the foregoing assessments, the Authority on November 1, 1991, executed a lease and transfer agreement ("the Agreement") with the newly-formed Northside Hospital, Inc., a private, nonprofit corporation. Under the Agreement, the Authority leased the hospital's facilities and transferred all of its "Operating Assets" and "Existing Operations" — terms defined in the Agreement as discussed in detail below — to Northside for a term of 40 years. The "Leased Facilities" — again, a defined term in the Agreement — included certain tracts of real property in Fulton County and the facilities located thereon: Northside Hospital, a surgery center, office buildings, and improvements. The

4

Authority agreed to use its best efforts to cause the issuance of tax-exempt revenue anticipation certificates or other evidences of indebtedness in order to fund Northside's operation and expansion of the hospital system. The Authority also gave Northside the power to act for the Authority. Northside was to operate the hospital subject to certain restrictions, pay all of the Authority's debts and assume all of its liabilities incurred in connection with the Leased Facilities, Operating Assets, and Existing Operations, and make a yearly rent payment of $100,000. It appears from the record that the Authority and Northside have continued to renew their 40-year agreement each year. In so doing, the Authority reaffirms its determination that its agreement with Northside will promote the public health needs of the community and gives the Authority sufficient control to ensure compliance with the law and the fulfillment of its mission.

To the extent the Authority has maintained a post-lease existence apart from Northside, it is minimal. Northside board members and officers serve as Authority members. The Authority has no employees or staff of its own. Northside's director of legal services serves as the Authority's secretary and maintains the Authority's records, which are stored at Northside's legal offices.

The Authority generally holds quarterly meetings (usually at Northside) of about 30 minutes each.

Relevant to this dispute, between 2011 and 2013, Northside entered into transactions to acquire four privately-owned physician groups.[1] In 2013, after learning of these transactions, Smith sent a letter to Northside and the Authority, entitled "Open Records Request," seeking access to financial statements and other documents related to the acquisitions.[2] The Authority responded by informing Smith that it did not possess any records or documents that were responsive to his request. Northside also responded to Smith, declining to comply with his request. Northside told Smith that it is a private, nonprofit hospital that is not subject to the Act and that even if it were subject to the Act,

---

[1] Northside asserts that only some of the practices' assets have been acquired and that the practices remain independent, for-profit entities. But Northside acknowledges it has a fee simple interest in assets and/or operations related to the transactions.

[2] Specifically, the letter identified 15 different categories of requested documents related to each acquisition, including, for example, "[a]ll contracts, agreements, instruments, or other documents by which the [a]cquisition was effected in whole or in part"; "any indemnification agreements and any agreements concerning the management or operation . . . of any medical or healthcare practice acquired . . ."; documents that "constitute, evidence or reflect any consideration, compensation, or remuneration of any type provided by or on behalf of [Northside]"; and "[a]ll documents that constitute, evidence, or reflect any strategic plan or business forecast for assets, membership interests, or any other property or interest acquired in the [a]cquisition" for the 24 months preceding the acquisition.

6

the requested documents, which are "highly sensitive," would be exempt under various provisions of the Act, including the trade-secrets exemption. In addition, Northside informed Smith that it had entered into binding confidentiality agreements that prohibited disclosure of the requested documents.

Smith subsequently filed this lawsuit against Northside, requesting that the trial court compel Northside to comply with his open records request. The trial court later permitted three of the four private practices that Northside acquired to intervene in the case, two as defendants and the third as a third-party plaintiff seeking declaratory relief. The case ultimately proceeded to a bench trial, which was bifurcated to resolve the two dispositive issues before the trial court: (1) whether the documents in question were "public records" under the Act; and (2) if so, whether the records contained exempt trade secrets. After Smith presented his evidence as to the first issue, Northside and the intervenors moved for an involuntary dismissal of the case, and the trial court denied the motion. But when Northside and the intervenors renewed the motion after the close of all the evidence on the first issue, the court granted it. The Court of Appeals affirmed, and we granted certiorari.

"In reviewing a bench trial, we view the evidence in the light most favorable to the trial court's rulings, defer to the trial court's credibility judgments, and will not set aside the trial court's factual findings unless they are clearly erroneous." Gibson v. Gibson, 301 Ga. 622, 624 (801 SE2d 40) (2017). A trial court's involuntary dismissal of a claim pursuant to OCGA § 9-11-41 (b) "may be reversed only if the evidence demands a contrary finding." Id. (citation and punctuation omitted). But a trial court's conclusions of law are subject to de novo review. Second Refuge Church of Our Lord Jesus Christ, Inc. v. Lollar, 282 Ga. 721, 724 (2) (653 SE2d 462) (2007). And the application of the wrong legal standard may be reversible error. See Great Amer. Dream, Inc. v. DeKalb Cnty., 290 Ga. 749, 752 (1) (727 SE2d 667) (2012).

*1. A public agency need not always have direct involvement in or even knowledge of a particular action of a private entity for that action to qualify as the performance of a service or function "on behalf of" the agency.*

Under the Act, "[a]ll public records shall be open for personal inspection and copying, except those which by order of a court of this state or by law are specifically exempted from disclosure." OCGA § 50-18-71 (a). The Act previously defined public records as only those records "prepared and maintained or received in the course of the operation of a public office or

8

agency" or "received or maintained by a private person or entity on behalf of a public office or agency[.]" See Ga. L. 1992, pp. 1061, 1064 § 5 (codified at prior version of OCGA § 50-18-70 (a)). In 1999, the Legislature amended the statute to include records "received or maintained by a private person, firm, corporation or other private entity in the performance of a service or function for or on behalf of an agency[.]" Ga. L. 1999, pp. 552, 553, § 1. OCGA § 50-18-70 has since been amended, see Ga. L. 2012, pp. 218, 226, § 2, but the Legislature retained the "in the performance of a service or function for or on behalf of an agency" language; it now defines "public records" to include "all documents . . . prepared and maintained or received by an agency or by a private person or entity in the performance of a service or function for or on behalf of an agency[.]" OCGA § 50-18-70 (b) (2). The definition of "agency" employed by the statute includes "[e]very . . . authority" of "every county . . . of this state." See OCGA § 50-14-1 (a) (1) (B), (C); OCGA § 50-18-70 (b) (1).

The parties agree that the Authority is an "agency" and Northside is not; the only question posed by this appeal is whether the documents sought by Smith were "prepared and maintained or received by" Northside "in the performance of a service or function for or on behalf of" the Authority. In

9

construing a statute, "we must afford the statutory text its plain and ordinary meaning, we must view the statutory text in the context in which it appears, and we must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would." Deal v. Coleman, 294 Ga. 170, 172-173 (1) (a) (751 SE2d 337) (2013) (citations omitted).[3] Dictionaries define "on behalf of" as including "as the agent or representative of," "on the part of," and "in the name of." See Black's Law Dictionary 184 (10th ed. 2014); Bryan A. Garner, A Dictionary of Modern American Usage 78 (1998); see also Webster's New Collegiate Dictionary 141 (9th ed. 1991). In the context of the statute, a private entity acts "on behalf of" a government agency when the agency arranges for the private entity to perform a government function that the agency would otherwise have to perform. But nothing in this statutory text requires that the agency direct the private entity in the specific details of its work, or even know those details, in order for the records of that work to be

---

[3] The General Assembly has directed us to construe the Act broadly in favor of making "governmental records" available to the public. OCGA § 50-18-70 (a). Drawing a distinction between the terms "public" and "governmental," Northside argues that a private entity's records could never be deemed "governmental records," and urges us to construe the statute narrowly in its favor given the availability of criminal penalties for noncompliance. We need not resolve this question of statutory construction here; instead, we simply construe the Act reasonably.

public records; it is certainly possible for an entity that has been given a broad charge to work on an agency's behalf to do that work without informing the agency about everything.[4]

Both the trial court and the Court of Appeals employed a narrower standard, requiring Smith to show that the Authority approved, directed, or was involved with the specific transactions at issue. In concluding that Smith had not shown that the documents that he sought were public records, the trial court stated that there was no evidence that Northside "entered into or performed any of the transactions for or on behalf of the Authority, or exercised any of the Authority's powers when doing so[,]" no evidence "that the Authority discussed in advance, requested, approved, or authorized Northside to enter into the transactions at issue[,]" and no evidence that "the Authority was involved in any way in the negotiating of the transactions or preparing, executing, maintaining, or receiving the documents sought." The trial court found that it could not

---

[4] In the analogous context of a principal/agent relationship, an agent may bind its principal without the principal's knowledge. See OCGA § 10-6-56 ("The principal shall be bound by all representations made by his agent in the business of his agency and also by his willful concealment of material facts, although they are unknown to the principal and known only by the agent.").

conclude "that Northside functioned under the direction and control of the Authority as its vehicle to implement the Authority's duty to provide public health, or that there is a shared ownership and control between the Authority and Northside such that the documents at issue were generated or maintained by Northside on behalf of the Authority."  In affirming the trial court, the Court of Appeals wrote:

> Smith seeks documents related to commercial transactions between private entities, which the Authority had no knowledge, interest, or involvement in to any degree. Indeed, these acquisitions were negotiated and executed solely by Northside for its own private purposes, and it did not seek the Authority's approval or even inform the Authority of its plans in advance. Moreover, Smith presented no evidence that any public officials participated in the negotiations, and it was undisputed that no public funds were used to finance the acquisitions.

Northside Hosp., 336 Ga. App. at 856-857 (1).

Evidence that a public official directed or had knowledge of a particular action may be one way to determine that the action was undertaken on behalf of a public agency, but it isn't always necessary. When the work a private entity does for an agency is a relatively discrete task, looking for specific government involvement or approval may well be appropriate. But when the scope of the task given to a private entity is much broader, it's less reasonable to require

12

specific government involvement at every step as the sine qua non of whether the private entity is performing a service or function on behalf of the agency.

Considering a hypothetical example of a more typical contractual arrangement between a public agency and a private entity helps explain how this is so. A city ordinance charges city government with collecting trash in city parks. The city elects to contract with a private waste management company to perform that function; records related to the company's performance of that contract would be public records. The company also collects trash from nearby residents; a rumor gets out that the city is paying for it. To determine whether the company's records related to the collection from residents are public, a court would consider whether the government had approved, knew about, or was otherwise involved in extending the company's service from city hall to the residents.

On the other hand, an arrangement with a broader scope would entail a different analysis. The same city is charged with providing waste management services to its residents, but determines that the private sector would do the job more effectively. The city contracts with the private company to provide waste management services for all the city's residents. The city's direction to the

company is both broad and simple: pick up the trash. Records of the private company related to the company's provision of waste management services to the city's residents pursuant to the contract with the city would be public records under the Act (while, of course, other records of the private company would not). And if the private company decided it needed more help and hired subcontractors to assist on the city contract, records related to that arrangement would be public records regardless of whether the city council knew about it.

It's difficult to imagine an arrangement with a broader scope than the Authority's lease of virtually all of its property and delegation of nearly all of its authority to Northside, for the stated purpose of better fulfilling the Authority's mission. And so whether evidence of specific Authority involvement in a particular transaction is present here is the wrong question to ask, given the nature of the relationship between the Authority and Northside and the complex task with which Northside is charged under that relationship.

*2. At least some of what Northside does is "on behalf of" the Authority.*

Northside would have us believe that the Act applies even less to its work than to the work of our hypothetical waste management company, because Northside isn't doing anything on behalf of the Authority; it simply is a tenant

14

of the landlord Authority. Northside is wrong. And we see why when we consider Northside's account of its relationship with Authority: that, "[a]s the Hospital Authorities Law authorized it to do, the Authority privatized the hospital and got out of the healthcare business altogether — removing politics and itself from hospital operations — and allowed Northside to independently conduct its private operations without interference, input, oversight, direction, or control." This is simply not a correct statement of the law or of what the Authority actually did.

To understand the nature of the Authority's relationship with Northside, it is important to understand the Georgia Hospital Authorities Law (OCGA § 31-7-70 et seq.), the statute authorizing their arrangement. Known for the name of our decision explaining the parameters under which they are properly established, see Richmond Cnty. Hosp. Auth. v. Richmond Cnty., 255 Ga. 183 (336 SE2d 562) (1985), "Richmond County hospitals" are permissible under a provision in the statute that allows county hospital authorities "[t]o lease for any number of years up to a maximum of 40 years for operation by others any project[.]" OCGA § 31-7-75 (7). The statute requires that the hospital authority must first determine that the lease "will promote the public health needs of the

15

community by making additional facilities available in the community or by lowering the cost of health care in the community." Id. The authority also must retain "sufficient control over any project so leased so as to ensure that the lessee will not in any event obtain more than a reasonable rate of return on its investment in the project," in keeping with the statutory prohibition on hospital authorities operating or constructing any project for profit. Id.

The law thus does not permit the Authority to get "out of the healthcare business altogether." The Hospital Authorities Law does not allow the Authority to surrender all "input, oversight, direction, [and] control" of its public assets to a private entity. And we must reject any interpretation of Northside's relationship with the Authority that is contrary to the Hospital Authorities Law. It is axiomatic that government officials are presumed to act in accordance with the law; we said as much in the first case decided by this Court. See Doe ex dem. Truluck v. Peeples, 1 Ga. 1, 1 (1846) ("the court will presume in favor of public officers, in the absence of all proof to the contrary, that they discharge their duty in compliance with the law"). "[U]ntil the contrary appears, it will be conclusively presumed that . . . a public officer[] not only acted within the scope of his legal authority but acted properly in the performance of such duty and

16

only when authorized so to act." <u>Brantley v. Thompson</u>, 216 Ga. 164, 165 (115 SE2d 533) (1960) (evidence that clerk marked bills of exception "tendered" on certain date created presumption that judge was absent from circuit at that time, given that clerk was authorized to accept the bills of exception only when the judge was absent); see also <u>Fine v. Dade Cnty</u>., 198 Ga. 655, 663 (32 SE2d 246) (1944) (presuming that governor was acting upon a request from a grand jury from one of two counties when he ordered a survey to fix the boundary between the two, even though there was no evidence that he received such as request, as such a request was required by law).  As the Authority's decision to enter the Agreement with Northside was an act of public officials, we assume that the particulars of the agreement are legal, absent evidence to the contrary.  At any rate, by its terms the arrangement between the Authority and Northside does not amount to the Authority's complete exit from the business of healthcare.[5]

In our first decision blessing a hospital authority's lease of its hospital to

---

[5] Completely apart from the requirements of the Hospital Authorities Law, any suggestion that a lease of an exceptionally valuable hospital and related assets for minimal rent and the promise to operate the hospital wholly for its own purposes renders Northside simply an ordinary tenant might well raise constitutional questions. See, e.g., Ga. Const. of 1983, Art. III, Sec. VI, Par. VI (a) ("Except as otherwise provided in the Constitution, . . . the General Assembly shall not have the power to grant any donation or gratuity or to forgive any debt or obligation owing to the public[.]").

17

a private corporation, we made clear the corporation was promoting the purpose of the government: "There is no apparent reason why a suitable private corporation could not properly operate the hospital, either as lessee or as owner, so as to likewise promote the public health functions of government." Bradfield v. Hosp. Auth. of Muscogee Cnty., 226 Ga. 575, 583 (1) (176 SE2d 92) (1970). The same is true here; notwithstanding Northside's arguments to the contrary, the Authority has entrusted Northside with far more than simply an ordinary lease of premises.

As set forth in resolutions adopted by the Authority in August 1991, Northside was created because the Authority had "concluded that the accomplishment of its mission and its responsibilities under the Hospital Authorities Law, as well as the continuation of the high quality and level of its health care services, can best be accomplished by the lease and transfer of its projects, including its assets and operations to, subject to the assumption of its liabilities and other obligations by, a Georgia nonprofit corporation[.]" In accordance with that conclusion, the Authority gave Northside a broad mandate: operate and expand the Authority's health system in the Authority's stead. In the original Agreement, the Authority delegated to Northside "the power and

18

authority to stand in the place of the Authority and to do and perform all things that the Authority is authorized or empowered to do by law in the transaction of all business in connection with the operation of the Leased Facilities" and provided that "Northside shall have full power to act for the Authority, in the Authority's name, place and stead in any and all circumstances, except as prohibited by law or otherwise provided in this Agreement." Northside notes that the Agreement provided that Northside would operate the hospital system "in furtherance of Northside's purposes[.]" But the Agreement identified the only permissible such purposes as those "set forth in [Northside's] Articles of Incorporation and as otherwise permitted by this Agreement." Those Articles of Incorporation require Northside to "operate, directly and indirectly, health care facilities for the benefit of the general public[.]"

Moreover, in assenting to its arrangement with Northside, the Authority affirmed in multiple instances that Northside's work was fulfilling the mission of the Authority:

- In the August 1991 resolutions, the Authority certified that the arrangement with Northside would "promote the public health needs of the community by making additional facilities and services available in the community and by lowering the cost of health care in the community, and the proposed restructuring plan retains sufficient public control of the

19

Authority's projects as is contemplated by the Hospital Authorities Law to ensure the continued fulfillment of the Authority's mission of providing quality health care at reasonable costs to the community served by the Authority."

- The Authority also certified in those resolutions that Northside's Articles of Incorporation and bylaws were "sufficient to promote the operation of the Authority's projects consistent with the Hospital Authorities Law, to safeguard the assets and operations of the Authority, and to carry out the mission of the Authority."

- The original Agreement dated November 1, 1991, reiterated the Authority's determination that the Agreement would "promote the public health needs of the community by making additional facilities available in the community and by lowering the cost of health care in the community, . . . that this Agreement retains sufficient control by the Authority over the Hospital as is contemplated by the Hospital Authorities Law[,]" and that "continuation of the high quality and level of health care services currently rendered at the Hospital can best be accomplished by transferring the operations, assets and liabilities of the Hospital, as well as other Authority facilities and assets, to a nonprofit corporation[.]"

- A November 1, 1991, assumption agreement among the Authority, Northside, and Wachovia Bank of Georgia, NA, whereby Northside agreed to assume the Authority's debt to Wachovia, said the Authority had determined that it could "best accomplish its mission and responsibilities under the Hospital Authorities Law" through its arrangement with Northside.

The Authority has continued to reaffirm that its arrangement with Northside fulfills the Authority's mission, and that it retains sufficient control over the arrangement to ensure that continues to be the case:

20

- In a February 2, 2010, resolution approving the renewal of the lease, the Authority confirmed that it "retains sufficient control of the Authority's objects as is contemplated by the Hospital Authorities Law to ensure the continued fulfillment of the Authority's mission of providing quality health care at reasonable costs to the community serviced by the Authority and to ensure that all such leased projects are operated in a manner consistent with the mandate in the Hospital Authorities Law specifying that no authority shall operate or construct any project for profit."

- The renewal agreement dated January 7, 2013 included the Authority's reaffirmation that the agreement "will promote the public health needs of the community by making additional facilities available in the community or by lowering the cost of healthcare in the community, and that this Agreement retains sufficient control by the Authority over the Hospital as contemplated by" the Georgia Hospital Authorities Law and that "the Authority believes that continuation of the high quality and level of healthcare services currently rendered at the Hospital can best be accomplished by transferring the operations, assets and liabilities of the Hospital, as well as other Authority facilities and assets, to a nonprofit corporation[.]"

Although the Authority may not be involved in the day-to-day operations of the hospital system it leases to Northside, Northside remains accountable to the Authority — at least if it wants the relationship to continue. The Agreement between the two places a host of obligations on Northside, including that it will never attempt to operate the hospital as a for-profit business entity, and that it will charge rates consistent with that constraint. The Authority may terminate the Agreement prior to its expiration if Northside fails to fulfill any of those

21

obligations. In addition, a reversion provision in the Agreement requires that in the event of termination or expiration Northside must return more than just the real property and buildings that the Authority leased to it. It also requires the return of "Operating Assets," defined in the Agreement by a list that includes, with the exception of certain retirement plans, "[a]ll cash, bank accounts, savings and loan accounts, certificates of deposit, money market accounts, treasury bills, other investments and revenues . . . owned by the Authority in connection with the Leased Facilities or otherwise[.]" The Agreement specifies that the term "Operating Assets" includes "all subsequent accumulations and additions thereto, and less all deletions and deductions therefrom, as may have occurred in the ordinary course of business of Northside or as otherwise may have been permitted by the terms of this Agreement." The reversion provision also requires the return of "Existing Operations," defined as "all of the hospital, health care, administrative and related activities conducted by" the Authority or Northside "in the ordinary course of owning and operating the Leased Facilities." The reversion provision specifically provides for the disposition of assets the Authority cannot legally own or operate, with the proceeds going to the Authority. The reversion provision also provides that

22

the Authority will assume Northside's liabilities at the termination of the lease, to the extent it can legally do so. Thus, Northside stands to lose much of its efforts at the expiration of the Agreement — or sooner if it does not comply with the Agreement — and the Authority stands to gain.[6] It follows that, even if the Authority has no day-to-day involvement in the healthcare system's operations, at least some of what Northside does is "on behalf of" the Authority.

Nothing in the case law on which the Court of Appeals focused requires a different conclusion. Prior to this case, the Court of Appeals' case law was in accord with the notion that the records of Richmond County hospitals generally are considered "public records" under the Act, even under a prior, narrower definition of "public records." See Northwest Ga. Health Sys., Inc. v. Times-

---

[6] Northside emphasizes that the Hospital Authorities Law allows a county hospital authority to not only lease, but sell, its facilities. See OCGA § 31-7-75 (6). Smith points out that a hospital authority's ability to sell assets is constrained, such as by a requirement for a hearing with the opportunity for public comment. See id.; OCGA § 31-7-400 et seq. But putting aside Northside's troubling suggestion that a hospital authority could truly "remove itself from the provision of healthcare services altogether[,]" that is not what has happened here. As detailed above, the Agreement provides that the Authority will retain control over the arrangement sufficient to ensure compliance with the law. The Agreement and Northside's Articles of Incorporation provide that Northside will operate so as to promote the health of the general public, and the Authority continues to certify that its arrangement with Northside is sufficient to carry out the Authority's mission. Moreover, as detailed above, the Agreement contains a broad reversion provision under which the Authority stands to recoup a wide variety of assets beyond the facilities that it leased to Northside.

23

Journal, Inc., 218 Ga. App. 336, 339 (1) (461 SE2d 297) (1995) (records of a private entity, its holding company, and subsidiaries were subject to the Act given that the subsidiaries contractually agreed to operate public hospital authority assets for the public good and the entity's stated corporate purpose was in part to operate those assets for the benefit of and performing the function of several hospital authorities). See also Richmond Cnty. Hosp. Auth., 255 Ga. at 192 (2) (c) (noting that open records and open meetings issues did not arise because the lease agreement made clear the corporation would comply with the laws).

In this case, the Court of Appeals relied primarily on Corporation of Mercer University v. Barrett & Farahany, LLP, 271 Ga. App. 501 (610 SE2d 138) (2005), but that decision, later superceded by a statute that specifically addressed campus police records, see Ga. L. 2006, pp. 519, 522-523 § 5, came in a case in which the police force whose records were sought was established by an indisputably private entity, a private university; although the plaintiff pointed to the police force's obligations to report certain matters to other law enforcement agencies, there was "no evidence that any public office or agency ha[d] expressly requested the [police force] to perform a service or function on

24

its behalf." Mercer Univ., 271 Ga. App. at 505 (1) (b). In the other cases relied on by the Court of Appeals here, the appellate court ruled that the records sought *were* "public records," even though many of those were decided under a previous, narrower definition of that term. See Macon Telegraph Pub. Co. v. Bd. of Regents of the Univ. Sys. of Ga., 256 Ga. 443, 445 (350 SE2d 23) (1986) (accounting records of association to which public university assigned task of operating its athletics program were "prepared and maintained in the course of the operation of a public office"); Hackworth v. Bd of Ed. for City of Atlanta, 214 Ga. App. 17, 20 (1) (a) (447 SE2d 78) (1994) (records of school bus drivers employed by private company were public records because they were "an integral part of the course of the operation of public agency"); Clayton Cnty. Hosp. Auth. v. Webb, 208 Ga. App. 91, 94-95 (1) (430 SE2d 89) (1993) (records of county hospital authority's corporate affiliates "received or maintained by a private person or entity on behalf of a public office or agency"; authority admittedly had the documents in its possession). The Court of Appeals also distinguished more recent cases in which records were deemed public under the current language and implied that those cases involved factors not present here. See United Healthcare of Ga., Inc. v. Ga. Dept. of Cmty.

25

Health, 293 Ga. App. 84, 87-89 (1) (666 SE2d 472) (2008) (records of private corporation relating to its contract with state agency for administration of state health benefits plan were public where administration of the plan involved "current and future expenditure of substantial public funds" and public officials were "actively" involved in plan issues even after contract executed); Central Atlanta Progress, Inc. v. Baker, 278 Ga. App. 733, 735-738 (1), 739-740 (3) (629 SE2d 840) (2006) (bids for NASCAR Hall of Fame and 2009 Super Bowl were public records where public officials involved in preparation and promotion of bids and significant public funds were involved in preparation and/or ultimate success of bids). But the presence of certain factors in a given case in which records were deemed public does not mean that those factors are necessary for such a finding.

3. *A remand is required for the trial court to apply the correct standard.*

Which of Northside's actions qualify as "on behalf of" the Authority may be a trickier question. As alluded to by our earlier city trash collection hypothetical, the question would be easier to answer if the Authority had contracted an established nonprofit to manage Northside Hospital's operations; the nonprofit's other endeavors would not be subject to the Act. But here

26

Northside was created for the purpose of carrying out the Authority's mission.

Moreover, as we observed in <u>Richmond County Hospital Authority</u>, seemingly

tangential operations may actually be closely tied to the operation of a hospital:

> A hospital must attract private paying patients or else it will become a deficit-ridden, indigent-only hospital, dependent upon tax dollars to keep its doors open. The private paying patient is often located outside the bounds of Richmond County, and innovative health-care delivery systems are needed to attract these patients and their dollars to University Hospital. Maintaining physicians on the staff of University Hospital is essential to retaining a private-paying-patient base and ensuring the continued viability of the hospital. Joint ventures with physicians of University Hospital, permissible under the lease, are essential to maintaining the loyalty of such physicians. Joint ventures with physicians in health care, permissible under the lease, would allow the development of additional health-care facilities without the need to raise all of the capital in the public sector, thereby saving taxpayer dollars.

<u>Richmond Cty. Hosp. Auth.</u>, 255 Ga. at 191 (2) (a).

It is plain that Northside's work in operating the "Leased Facilities," i.e.,

the original leased hospital complex in Fulton County and any improvements

thereto, is work "on behalf of" the Authority. The Authority owns those

facilities, and the definitions of the "Operating Assets" and "Existing

Operations" that will revert to the Authority upon expiration or termination of

the Agreement are tied to operation of those facilities. But other actions may

27

meet that definition as well, depending on how closely related those actions are to operation of the Leased Facilities.

In dismissing Smith's action, the trial court decided no disputed issues of fact but, rather, resolved a legal dispute about the proper application of the Act to the undisputed facts. Because the trial court applied the wrong legal standard in so doing, remand is required. See Great Amer. Dream, 290 Ga. at 752 (1). Moreover, application of the right standard requires a fact-intensive inquiry made difficult in this appeal given the divergent, all-or-nothing positions taken by the parties. Northside argues that nothing it does is for or on behalf of the Authority. At the very least, however, Northside's operation of the Leased Facilities is done on behalf of the Authority. How closely the transactions at issue are tied to operating the Leased Facilities will determine whether documents are "public records." Smith argues that everything Northside does is for or on behalf of the Authority and thus all of its records are public. Because of this position, he has not endeavored to connect the particular records he seeks to the operation of the Leased Facilities. This is not an issue the parties have briefed in any meaningful way. We remand for the trial court to consider in the first instance whether the records in question are sufficiently connected

28

to the operation of the Leased Facilities to constitute public records under OCGA § 50-18-70 (b) (2), and, if so, whether the records may nevertheless be withheld pursuant to a statutory exemption.

Judgment reversed and case remanded. Hines, C. J., Melton, P. J., Benham, Hunstein, Nahmias, Blackwell, Boggs, JJ., and Judge Meng H. Lim concur. Grant, J., disqualified.

S16G1463.  SMITH v. NORTHSIDE HOSPITAL, INC. et al.

MELTON, Presiding Justice, concurring.

I concur fully in the majority opinion. However, I write separately to emphasize that the Authority in this case has so blurred the lines between its public functions and those that it has seemingly delegated to Northside that it cannot be credibly stated that Northside is so completely separated from the Authority that none of the records sought in this case could even possibly be classified as "public records." Indeed, it defies credulity that Northside could be completely separate from and do nothing "on behalf of" the Authority when it was the Authority itself that "*created*" Northside for the purpose of carrying out virtually all of its public duties. I question the extent to which the Authority itself, as opposed to its principals acting in their individual capacities, can legally create a private entity that is wholly independent of the Authority's legislatively imposed duties and responsibilities. However, at times, the Authority has hinted that it has done just that, perhaps relying on an overly broad reading of Richmond County Hospital Authority v. Richmond County, 255 Ga. 183 (336 SE2d 562) (1985), and the language in the Lease and Transfer

Agreement through which the Authority established its ongoing relationship with Northside. Specifically, according to the Lease and Transfer Agreement:

> The restructuring plan adopted by the Authority is authorized under Georgia law. Georgia's Hospital Authorities Law (O.C.G.A. §§ 31-7-70 et seq.), as confirmed by the Georgia Supreme Court's decision in Richmond County Hospital Authority v. Richmond County, 255 Ga. 183, 336 S.E.2d 562 (1985), authorizes a corporate restructuring of a hospital authority through a lease and transfer of hospital assets to a new 501(c) (3) nonprofit corporation *formed by the hospital authority*.

(Emphasis supplied.) However, nothing in Richmond County Hospital Authority stands for the proposition that an Authority itself can create a private entity to fulfill its public mission, or that any records generated by that private entity in connection with the Authority's public mission would not be subject to the Georgia Open Records Act. Nor could the Authority, by delegating the bulk of its responsibilities to a private entity to fulfill its public mission, avoid its other statutory responsibilities under the law. And where, as here, Northside was basically a de facto replacement for the Authority with respect to its public mission of providing health care throughout Fulton County, I believe that there may be several records related to Northside's fulfillment of that public mission that would be properly classified as "public records." See OCGA § 50-18-70 (b)

2

(2) ("'Public record' means all documents, papers, letters, maps, books, tapes, photographs, computer based or generated information, data, data fields, or similar material prepared and maintained or received by an agency or by a private person or entity in the performance of a service or function for or on behalf of an agency or when such documents have been transferred to a private person or entity by an agency for storage or future governmental use"). However, I agree with the majority that it is for the trial court to engage in the appropriate factual inquiry on remand to decide whether the records in question in this case constitute public records.