**FIRST DIVISION**
**BARNES, P. J.,**
**GOBEIL and MARKLE, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**January 19, 2022**

# In the Court of Appeals of Georgia

A21A1763. GUNDY v. BALLI et al.

MARKLE, Judge.

After the Judicial Qualifications Commission (JQC) filed ethics charges against Judge Terrinee Gundy, she filed a petition for a writ of quo warranto against the JQC and its individual members on the ground that the members had not been properly and timely appointed.[1] Following a hearing, the trial court denied the petition, finding that the appointments were submitted to the Senate for confirmation, as required by

---

[1] Under OCGA § 9-6-60, "[t]he writ of quo warranto may issue to inquire into the right of any person to any public office the duties of which he is in fact discharging." As our Supreme Court has explained, "[q]uo warranto is an extraordinary remedy which exists solely by virtue of statute." (Citation and punctuation omitted.) *Richardson v. Phillips*, 285 Ga. 385 (677 SE2d 117) (2009). Prior to filing a petition for a writ of quo warranto, the petitioner must obtain leave of court. *Everetteze v. Clark*, 286 Ga. 11, 12-13 (2) (685 SE2d 72) (2009); see also OCGA § 9-6-60. Here, there is no dispute that Gundy has standing to bring the petition, and that she requested and obtained leave of court to do so.

statute, when they were timely given to the secretary of the senate. Gundy now appeals. For the reasons that follow, we affirm.

At issue is the process by which the senate confirms appointments to the JQC. Under OCGA § 15-1-21 (g) (1),

> [t]he names of the appointees required by this Code section *shall be submitted by the appointing authorities to the Senate no later than the third Monday in January*. Any member appointed to the commission shall serve until the Senate confirms such appointee, and *if an individual's name is not submitted by such deadline, he or she shall not be eligible for confirmation*.

(Emphasis supplied.). Because the issues raised on appeal involve the interpretation of this statute, we apply a de novo review. *Hill v. First Atlantic Bank*, 323 Ga. App. 731, 732 (747 SE2d 892) (2013).

The facts are largely undisputed. In 2016, Georgia voters amended the state constitution to alter the structure and power of the JQC after the General Assembly expressed concern over the lack of oversight of the existing JQC while under the auspices of the State Bar. Ga. Const. of 1983, Art. VI, Sec. VII, Par. VI (effective Jan. 1, 2017); OCGA § 15-1-21 (a) (2017); Gabriel L. Daniel, *House Bill 808: Courts; Judicial Qualifications Commission; Create*, 10 J. Marshall L. J. 239, 244 (2017).

2

Under the new format, the JQC was divided into two panels: a seven-member investigations panel, and a three-member hearing panel. OCGA § 15-1-21 (e) (1). Unlike the previous composition of the JQC, members of these two panels would be appointed by the governor, the president of the senate, the Supreme Court of Georgia, and speaker of the house of representatives. OCGA § 15-1-21 (f) (3) (A), (4) (A). The appointments were statutorily required to be confirmed by the Senate, and the confirmation process mandated that the appointments be "submitted . . . to the Senate" by the third Monday in January. OCGA § 15-1-21 (b), (g) (1). Failure to meet this deadline made the appointee ineligible to serve on the JQC. OCGA § 15-1-21 (g) (1).

The parties agree that this deadline in 2018 fell on January 15. That year, the Senate was in session from January 8 through 11. On January 12, each of the nominating entities notified the lieutenant governor, who also serves as the president of the senate, of their appointments. Ga. Const. of 1983, Art. V, Sec. I, Par. III. That same day, counsel to the lieutenant governor gave the secretary of the senate those names, and the secretary of the senate time stamped each appointment when he received it. On January 18, which was the next day the Senate was in session, the

3

secretary of the senate placed a memo with the names of the appointments on each senator's desk. In the memo, the secretary of the senate wrote:

> Georgia law provides for Senate confirmation of appointments to the Judicial Qualifications Commission. Pursuant to Senate Rule 3-3.1, I am notifying the Senate that the Governor, Lt. Governor, Speaker of the House of Representatives, and Supreme Court of Georgia have submitted to the Senate the names of their appointments for confirmation. The names of the appointees are attached for your review. Pursuant to Senate rules, these appointments will be referred to the Committee on Assignments. The Committee on Assignments will report its recommendations on the appointments to the Senate after which the Senate may proceed to consider confirmation.

The Senate Journal for January 18 contains a copy of the memo and the letters of appointment from each of the nominating entities.[2] Ga. Const. of 1983, Art. III, Sec. V, Par. I. The president of the senate referred the appointments to the committee on assignments, as set out in the Senate rules, and ultimately, each appointee was confirmed.

---

[2] Most of the appointees began serving their terms while the Senate was not in session and therefore did not need to be confirmed until the next legislative session. OCGA § 15-1-21 (g) (3).

In 2019, the JQC investigations panel brought formal charges against Judge Gundy. Gundy then filed a petition for a writ of quo warranto, challenging these appointments on the ground that delivering the names to the secretary of the senate did not constitute "submitted . . . to the Senate" under the statute. See OCGA § 15-1-21. She argued that this phrase referred to the time when the senators actually received the names, and the sole evidence of when that occurred was found in the Senate Journal.[3] Gundy further argued that, because the Journal showed the names were given to the senators on January 18, after the deadline of the third Monday in January, the members were ineligible to serve on the JQC.

The trial court set the case for a bench trial. When Gundy appeared, she agreed to proceed with a bench trial to the extent that the petition raised only questions of law, but she also stated that she was not waiving her right to a jury trial on the factual issues. Gundy then presented her only evidence, which consisted of the Senate Journal entries from January 18, 2018. Counsel for the JQC and its members

_____

[3] Gundy initially sought injunctive relief and attorney fees, but withdrew those counts. Additionally, she originally named all of the JQC members individually, then later dismissed the individuals who were no longer members of either panel. She also challenged the 2019 reappointment of two members. Because she makes the same arguments regarding the timing of the 2019 appointments, we focus our discussion on the 2018 process.

confirmed that they intended to call David Cook, the secretary of the senate, to testify. At a subsequent hearing, Cook testified over Gundy's objection, explaining the procedure for how he received the names on January 12. Cook testified that it was customary for the secretary of the senate to receive appointments on the Senate's behalf for distribution to the senators; he would time stamp the appointments when he received them; and he would write a memo to the senators to maintain a paper record and place the memo on the senators' desks the next day the Senate was in session.

The trial court denied the petition for a writ of quo warranto, finding that the JQC members were properly appointed because the names were timely submitted to the Senate when they were given to the secretary of the senate on January 12, and that the phrase "submitted . . . to the Senate" in OCGA § 15-1-21 (g) (1) did not mean delivered to the individual senators.

Gundy now appeals from the denial of her petition, arguing that the trial court misinterpreted the statute when it found that delivering the names to the secretary of the senate satisfied OCGA § 15-1-21 (g) (1), and erred by considering any evidence other than the Senate Journal to determine when the names were submitted. She

6

further contends that the trial court erred by deciding disputed issues of fact without a jury trial. We do not find these arguments persuasive.

The question before us involves one of statutory construction. When we are tasked with determining the meaning of a statute,

> [o]ur interpretation and application of statutory language is guided by the following principles: A statute draws its meaning, of course, from its text. Under our well-established rules of statutory construction, we presume that the General Assembly meant what it said and said what it meant. To that end, we must afford the statutory text its plain and ordinary meaning, we must view the statutory text in the context in which it appears, and we must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would. Though we may review the text of the provision in question and its context within the larger legal framework to discern the intent of the legislature in enacting it, where the statutory text is clear and unambiguous, we attribute to the statute its plain meaning, and our search for statutory meaning ends. But when the language of a statute or regulation is not obvious on its face, we should employ other tools of construction to interpret it and resolve its meaning. Those rules require that we give due weight and meaning to all of the words of the statute, and we are not authorized to disregard any of the words of the statute in question unless the failure to do so would lead to an absurdity manifestly not intended by the legislature.

(Citations and punctuation omitted.) *PTI Royston v. Eubanks*, 360 Ga. App. 263, 266-267 (1) (861 SE2d 115) (2021); see also *DeKalb County Bd. of Tax Assessors v. Astor Atl*, 349 Ga. App. 867, 869 (826 SE2d 685) (2019). Moreover, the "common and customary usages of the words" are important and "include the usual and customary meaning of terms as used in a legal context." (Citations and punctuation omitted.) *Fed. Deposit Ins. Corp. v. Loudermilk*, 305 Ga. 558, 562 (1) (826 SE2d 116) (2019); see also OCGA § 1-3-1 (b) (words in statutes are given their ordinary significance); *Smith v. Northside Hosp.*, 302 Ga. 517, 521 (1) (807 SE2d 909) (2017); *Institute for Justice v. Reilly*, 351 Ga. App. 317, 319 (1) (830 SE2d 793) (2019) (physical precedent only). When we consider the meaning of the statutory text, "we may look to other provisions of the same statute, the structure and history of the whole statute, and the other law—constitutional, statutory, and common law alike—that forms the legal background of the statutory provision in question." (Citation and punctuation omitted.) *Loudermilk*, 305 Ga. at 562 (1).

With these standards in mind, we turn to the questions before us: (a) what is required to "submit" the appointees' names to the Senate; (b) what evidence may the court consider to determine if the submission was timely; and (c) was the trial court required to provide a jury trial on these issues. We consider each in turn and note that,

8

as the party seeking a writ of quo warranto, Gundy bears the burden of showing that she was entitled to relief. *Anderson v. Poythress*, 246 Ga. 435 (1) (271 SE2d 834) (1980); *Grimsley v. Morgan*, 178 Ga. 40, 43 (172 SE 49) (1933).

a. *Submission to the Senate*.

The statute uses the words "submitted by the appointing authorities to the Senate." OCGA § 15-1-21 (g). Nothing in the statute, however, specifies what steps are necessary to constitute submission or to whom the names must be given. Upon review, we agree with the trial court that giving the names to the secretary of the senate, as one of the Senate officers, amounted to submission to the Senate.

The "Senate," as defined by our state Constitution, consists of the individual senators who are members of the Senate. Ga. Const. of 1983, Art. III, Sec. I, Par. 1; Art. III, Sec. II, Par. I (a). The Constitution also provides for two officers of the Senate who are not members of that body: the president of the senate and the secretary of the senate. Ga. Const. of 1983, Art III, Sec. III, Par. I (a); Art. III, Sec. III, Par. III; see also *Institute for Justice*, 351 Ga. App. at 324 (McFadden, J., dissenting).

The term "submit" is commonly defined as "to deliver formally." Merriam-webster.com/dictionary/submit (last visited December 30, 2021). When we consider

9

this definition in the context of the statute before us, we presume that the legislature "meant what it said and said what it meant." *DeKalb County Bd. of Tax Assessors*, 349 Ga. App. at 869. If the legislature had intended the statute to require placing the names before the individual members of the Senate to constitute submission, it could have said so by using the language "senators" or "members." See *Truist Bank v. Stark*, 359 Ga. App. 116, 119 (1) (854 SE2d 784) (2021) ("If the General Assembly desired to include [a specific reference to another statute], it would have done so.") (citation omitted). But it did not. By using the general term "Senate" instead of the specific term "senators," the legislature indicated that it did not require the individual members of the Senate to receive the names in order to constitute "submission" to the Senate.

This reading of the plain language is consistent with well-settled case law, as well as the Senate's own internal rules. See, e.g., *Horrigan v. Rivers*, 183 Ga. 141, (187 SE 836, 839) (1936) (addressing term "General Assembly" as the whole body and not its individual members); compare *Cartledge v. City Council of Augusta*, 189 Ga. 267, 269-270 (1) (5 SE2d 661) (1939) (the Constitution requires the General Assembly to publish amendments in the paper, without specifying who is responsible for ensuring that happens). Gundy's interpretation of the relevant statute, under which

"submission" would require the delivery of a copy of the appointment to every senator, is contrary to the very language of the statute.

Additionally, our state Constitution provides that the Senate shall determine its own procedural rules. Ga. Const. of 1983, Art. III, Sec. IV, Par. IV. Here, the Senate rules set forth the following process of confirming appointments:

> Upon receiving the name of any person whose appointment to public office requires Senate confirmation, the President of the Senate shall refer such appointments to the Committee on Assignments. Such referral shall be made no later than the legislative day after receipt. The Committee on Assignments shall consider such appointments and may refer such appointments to one or more standing committees and shall instruct the Secretary of the Senate to notify the Senate that the names of such appointees have been received. . . . The Secretary of the Senate shall make the names of appointees submitted to the Senate for confirmation available for review by any Senator. . . .

Senate Rules 3-3.1 (a). This is exactly what occurred here: The president of the senate received the names; forwarded them to the secretary of the senate; and the secretary of the senate notified the senators that the names had been received. The instruction in Rule 3-3.31 that the secretary of the senate notify the senators that the appointments had been received would be redundant and unnecessary if the names could only be submitted by giving them to the individual senators.

11

Moreover, the customary usage of the phrase "submitted . . . to the Senate" is consistent with the acts taken here. The secretary of the senate is tasked with a variety of acts on behalf of the Senate as an institution. For example, the secretary of the senate is responsible for organizing the Senate under Rule 1-1.5 (c); receiving any ethics complaints filed under Rule 1-4.11 (a) (2), (3); distributing rules and bills to the senators, as set out in Rules 1-4.12, 4-2.10; receiving the filings of any bills to be introduced, as provided in Rule 3-1.2 (f); and notifying the senators when a message has been received, pursuant to Rule 4-2.2 (b). Moreover, in his testimony, the secretary of the senate stated that it was customary for him to receive the appointments on behalf of the Senate and then draft a memo to all the senators with the information. Thus, in a number of contexts, the secretary of the senate is charged with receiving information on behalf of the Senate as an institution and disseminating it to the individual senators.

Indeed, even our Supreme Court has recognized the increased role an officer can occupy and has held that the legislature may refer ministerial duties to certain officers in order to perform its constitutionally mandated functions. See *Pearle Optical of Monroeville v. Ga. State Bd. of Examiners in Optometry*, 219 Ga. 364, 375 (4) (133 SE2d 374) (1963) ("while it is necessary that a law, when it comes from the

lawmaking power, shall be complete, still there are many matters as to methods or details which the Legislature may refer to some designated ministerial officer or board. The Constitutional prohibition, therefore, does not deny to the lawmaking body the necessary resources of flexibility and practicality, which will enable it to perform its function[.]") (citations and punctuation omitted).[4]

Finally, we adhere to the well-settled principle that courts should presume public officials, such as senators, acted in accordance with their statutory duties and read the statute in a manner that renders their conduct proper. See *Wood v. Arnall*, 189 Ga. 362, 370 (1) (6 SE2d 722) (1939) (consistent with presumption of validity, construing statute in a way that rendered conduct constitutional); see also *Selph v. Williams*, 284 Ga. 349, 352 (667 SE2d 40) (2008) ("there is a presumption of

---

[4] The statutes providing for the clerk of the Supreme Court of Georgia also support this interpretation: The clerk is a officer of the court, but not a member, and is authorized to keep the minutes of the court and certify records on behalf of the court. OCGA §§ 15-2-20; 15-2-43 (3), (4). Numerous other statutes provide that materials be submitted to the specific government officer such as Secretary of State, Commissioner of Agriculture, and Commissioner of Insurance, but there is no dispute that the materials are properly submitted when delivered to staff members in those offices. See, e.g., OCGA § 21-2-132 (c) (1) (candidates file a notice of candidacy "in the office of the Secretary of State."); *Bell v. Raffensberger*, 311 Ga. 616 (858 SE2d 48, 49) (2021); OCGA § 10-4-148 (submitting reports to the Commissioner of Agriculture); OCGA § 33-40-4 (b), (c) (submissions to the Insurance Commissioner); OCGA § 48-5-273 (submissions to the Tax Commissioner).

13

regularity that requires the courts to presume that public officers have properly discharged their official duties."). When we apply that presumption here, we note that none of the senators expressed concern that the appointments were untimely, nor has the Senate since amended its rules to address the manner in which appointments are delivered. *Doctors Hosp. of Augusta v. Dept. of Community Health*, 356 Ga. App. 428, 432 (1) (a) (847 SE2d 614) (2020) ("The General Assembly's acquiescence to a rule is evidence that the rule came within its intent as expressed by the Code[.]") (citation and punctuation omitted); cf. *Owens v. State*, 353 Ga. App. 848, 851 (1) (840 SE2d 70) (2020) (General Assembly had not amended statute after recent court decisions interpreting it, thus supporting court's interpretation).

Essentially, Gundy asks us to invalidate the very actions of the Senate itself and not the statute that the Senate passed. We are loath to do so.[5] See *Murphy v. ACLU of Ga.*, 258 Ga. 637, 638 (5) (373 SE2d 364) (1988) ("In ordinary circumstances, the internal operating procedures of the General Assembly will not be subjected to

---

[5] Even if we agreed that submission to the secretary of the senate was not what the statute intended, it is clearly what the senate rules contemplate, and the Senate rules operate regardless of whether they are consistent with the statute. *Coggin v. Davey*, 233 Ga. 407, 411 (II) (211 SE2d 708) (1975); see also *Institute for Justice*, 351 Ga. App. at 320 (1) (recognizing that the legislature, as a co-equal branch of government, had the authority to pass its own rules).

judicial review."); *Stegall v. Southwest Ga. Regional Housing Auth.*, 197 Ga. 571, 582 (30 SE2d 196) (1944) ("It is a grave matter for this court to set aside an act of the co-ordinate legislative department[.]"). Accordingly, we conclude that the trial court properly found that delivering the names to the secretary of the senate satisfies the "submitted . . . to the Senate" language in OCGA § 15-1-21 (g).

b. *Evidence properly before the court.*

We next turn to whether the trial court's consideration was limited to the information in the Senate Journal, or if it was authorized to consider the testimony from the secretary of the senate to determine if the appointments were timely. We conclude that the trial court was not limited to the evidence in the Senate Journal to make this determination.

The Georgia Constitution provides that the Senate Journal is "the sole, official record" of the proceedings before the Senate. Ga. Const. of 1983, Art. III, Sec. V, Par. I. Nevertheless, our courts have never held that it is the sole *evidence* of the Senate's actions. Cf. *Carswell v. Wright*, 133 Ga. 714 (6) (66 SE 905) (1910) ("The Constitution does not require that the title of the bill be entered on the House journal, but only that the House shall keep a journal of its proceedings. . . . [I]t is only necessary that the [J]ournal indicate by appropriate terms or description the general

15

nature of the measure, so as to identify it as having been proceeded with in compliance with the Constitutional requirements."). More importantly, a party cannot use the Journal to invalidate a Senate action. See *Williams v. MacFeeley*, 186 Ga. 145, 149-152 (3) (197 SE 225) (1938); see also *Capitol Distrib. Co. v. Redwine*, 206 Ga. 477, 485-486 (1) (57 SE2d 578) (1950).

> As our Supreme Court explained almost a century ago,
>
> it is at best a matter of delicacy for the courts to go into the details of legislative procedure, critically examining the methods of a co-ordinate department of the government, and declaring that its members have failed or refused to obey Constitutional directions or commands as to the manner in which they should perform their duties, because of the entry, or the absence of an entry, on the journal kept by some clerk or subordinate employee.

*Williams*, 186 Ga. at 149-150 (3). Given this admonition, we are unwilling to limit the evidence in this case to the Senate Journal entries, and thus conclude that the trial court properly considered the secretary of the senate's testimony. See also *Murphy*, 258 Ga. at 638 (5) (declining to consider whether there had been violations of the legislature's internal rules).

c. *Right to a jury trial*.

16

Finally, Gundy contends that the trial court erred by conducting a bench trial on her petition when it considered factual issues surrounding her appointment. We disagree.

Under OCGA § 9-6-65, a jury must decide factual disputes raised by a petition for a writ of quo warranto. In contrast, purely legal questions can be decided by the trial court. OCGA § 9-6-64 (a). Here, Gundy at first acquiesced to a bench trial, but later clarified that, to the extent there were factual disputes, the trial court was not authorized to decide those. Pretermitting whether she waived a jury trial, we conclude that the facts were not in dispute; rather, the dispute centered on whether those facts were consistent with the statutory requirements. As the construction of a statute is a legal question, the trial court was authorized to decide the issues without a jury. See *Jones v. Boone*, 297 Ga. 437, 441-442 (3) (774 SE2d 668) (2015); see also OCGA § 9-6-64 (a).

For the foregoing reasons, we conclude that Gundy has not met her burden to show that the appointments to the JQC were not properly submitted to the Senate.[6] The evidence showed that the president of the senate received the names and gave

---

[6] For these same reasons, we conclude that the 2019 appointments were timely submitted.

17

them to the secretary of the senate before the applicable deadline. Accordingly, we affirm the trial court's denial of the petition for a writ of quo warranto.

*Judgment affirmed. Barnes, P. J., and Gobeil, J., concur*.